# United States Court of Appeals
## For the First Circuit

---

Nos. 02-2414, 03-1089, 03-1441

UNITED STATES OF AMERICA,

Appellee/Cross-Appellant,

v.

LEO V. FELTON; ERICA CHASE,

Defendants, Appellants/Cross-Appellees.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

---

Before

Boudin, Chief Judge,

Torruella and Selya, Circuit Judges.

---

Lenore Glaser for Leo V. Felton.
Timothy G. Watkins, Federal Defender Office, for Erica Chase.
S. Theodore Merritt, Assistant United States Attorney, with whom Michael L. Sullivan, United States Attorney, and Emily R. Schulman, Assistant United States Attorney, were on brief for the United States.

---

July 29, 2005

---

**BOUDIN, <u>Chief Judge</u>**.  After a nine-day trial, a federal jury convicted Leo Felton and Erica Chase of a number of offenses centering around a bank robbery, counterfeiting, and the planned construction of an explosive device.  The district court then directed a judgment of acquittal for both defendants on one of these counts--possessing a firearm in furtherance of a crime of violence.  The defendants now appeal from their convictions (and Felton from his sentence as well); the United States cross-appeals from the judgment of acquittal ordered by the district court.

We begin with a summary of the background facts. Although the facts are commonly stated in the light most favorable to the verdict, this perspective strictly applies only for challenges to the sufficiency of the evidence; other claims, including most of those made here (<u>e.g.</u>, prejudicial evidence), may require a more balanced treatment.  <u>See</u> <u>Gray</u> v. <u>Genlyte Group, Inc.</u>, 289 F.3d 128, 131 (1st Cir.), <u>cert. denied</u>, 537 U.S. 1001 (2002).  However, in this case, most of the raw facts are not reasonably disputable.

While serving a prison sentence in New Jersey, Felton--an avowed white supremacist--began plotting with other like-minded prisoners to set up a small "cell" when he was released in January 2001.  The goal of the cell was to incite a "racial holy war" through violent actions such as murders and bombings of targets associated with racial and religious minorities.  Among the other

prisoners involved in these plans were Thomas Struss, Wesley Dellinger, and Michael Reid.

By early 2000, Chase had begun corresponding with Felton through a prison outreach program run by the World Church of the Creator--a white supremacist group to which Chase belonged. In their letters Felton and Chase discussed their racist ideologies, and Felton began to suggest his plans for violent action after his release, although he did not mention anything specific. Upon his release, Felton returned to his wife in Ipswich, Massachusetts, and began putting his plans into action.

From prison, Felton had suggested that his wife purchase a firearm--purportedly for her own protection. She purchased a .38-caliber revolver; when he returned to Ipswich, Felton took over the gun and obliterated the serial number. He also purchased software and printing supplies to begin producing counterfeit bills on his home computer. In February 2001, when Struss was released from prison, Felton invited Struss to stay with him in Massachusetts and begin their cell's operations in earnest.

Upon Struss' arrival, Struss and Felton agreed that bank robberies, armored car robberies, and counterfeiting were all viable options for acquiring funds, and that with the funds thus acquired, the two would "go underground" and begin to incite interracial violence by bombing Jewish targets or killing Jewish, black, or civil rights leaders. Felton told Struss that Chase was

dedicated to their cause and would be joining their cell and helping with counterfeiting. He also mentioned the possibility of using fertilizer bombs to carry out their plans.

At the close of the evening, the two men decided that they would start off with an "easy" robbery designed to build trust between them. The next morning, Struss entered a bank in Copley Square scouted by both men, slipped the teller a demand note, and made off with approximately $1,100 in cash as Felton waited outside with his wife's gun; the two then fled. After dividing the proceeds, Felton gave Struss the gun and the two split up, planning to reunite in a few days' time.

Not long after, Struss was arrested in New Jersey in an attempted carjacking--apparently in preparation for an armored car robbery with another cell member in the area. When Struss was released on bail, Felton told him by telephone to return to Boston to assume a new identity, noting that Chase had progressed with the counterfeiting operations and could provide him with a "safe house." Struss never returned to Boston, choosing eventually to cooperate with the authorities and testify against Felton and Chase at trial.

Chase, meanwhile, had continued her correspondence with Felton, and the two had begun speaking frequently on the phone after his release. They started to coordinate the specifics of their counterfeiting operation, and Chase began to plan to move to

Boston and join Felton. Chase confided in a friend and fellow white supremacist, James Niemczura, that she intended to blow up a Holocaust or black history museum, and that Felton was planning on "robbing banks" and "blowing stuff up" after his release and did not expect to live for more than a year.

In late February 2001, Chase stole money from Niemczura and sent it to Felton to finance the startup costs of the counterfeiting operation in Ipswich. By mid-March, she had purchased a .40-caliber Iberia semi-automatic pistol, and had tried to purchase a second handgun but was unable to do so. Chase confided to Niemczura that she had purchased the gun "for protection . . . [f]rom anyone trying to interfere with her plan" with Felton.

She said that their plan was "to burn off their fingerprints with hot oil and assume the identities of missing children" so that they could "[g]o around and be terrorists," but she would not specify any further details for fear that Niemczura would be questioned by law enforcement. Chase did say that Niemczura would read about their exploits in the papers, and that she and Felton would go down in history.

In early April 2001, Chase arrived in Boston and moved into an apartment leased by Felton. The two began to pass counterfeit bills and gather the materials for a fertilizer bomb, including a coffee-maker to use as a timing device and a 50-pound

bag of ammonium nitrate fertilizer, both of which were stored in the apartment. Felton ordered explosive devices, to be delivered to his Ipswich residence, to ignite the bomb. When Felton told one of Chase's close friends that they were making a bomb, Chase nodded in assent. Chase confided in the same friend that she and Felton were counterfeiting, and she referred to the bomb as her "future" with Felton.

On April 19, 2001, Felton and Chase were arrested when Chase attempted to pass a counterfeit bill. Thereafter, Chase asked her close friend to remove from the Boston apartment the fertilizer bag, the wiring from the disassembled coffee-maker, items associated with the counterfeiting (including uncut bills and software), a box of Chase's correspondence and keepsakes, white supremacist paraphernalia, and Chase's pistol--which lay loaded on the nightstand in the same room as the fertilizer. Felton told his wife in Ipswich to destroy his computer hard drive.

Chase and Felton were charged with conspiring to make and possess a destructive device in violation of 18 U.S.C. § 371, see also 26 U.S.C. §§ 5845(f), 5861(d) & (f); possessing a firearm in furtherance of that offense, 18 U.S.C. § 924(c)(1)(A); counterfeiting and conspiracy to do so, id. §§ 371, 471 & 472; and conspiring to obstruct, and obstructing, justice, id. §§ 371 & 1512(b)(2)(B). Felton alone was charged with attempting to receive explosives to injure, kill, or destroy property, id. § 844(d); two

counts of being a felon in possession, id. § 922(g)(1); and two counts relating to bank robbery and Hobbs Act robbery, id. §§ 371, 1951 & 2113.

At the ensuing trial, the jury convicted both defendants on all counts, save that it acquitted Chase on the counterfeiting count. Having reserved the issue during trial, the district court granted motions for acquittal of both defendants on the charge of possessing a firearm in furtherance of the bomb-making conspiracy; the court deemed the evidence insufficient to establish the "in furtherance" element. United States v. Chase, 221 F. Supp. 2d 209, 220-21 (D. Mass. 2002). Felton was sentenced to 262 months in prison and Chase to 57 months.

On defendants' appeals, a central argument by Felton--and the sole argument to which Chase devoted her opening brief--is that the district court erred by admitting evidence of the defendants' ideological beliefs. Specifically, defendants object to the introduction of evidence linking them to white supremacist organizations or activities, including testimony regarding Chase's association with Matthew Hale and a photograph of Chase engaging in a Nazi salute while standing with Hale;[1] a World Church of the Creator pamphlet containing an article written by Chase about "white power" rallies she had attended; and a separate pamphlet by

---

[1]Matthew Hale is a well-known figure who headed the World Church of the Creator and was convicted in 2004 of plotting to kill a federal judge.

the church that discussed an apocalyptic "future" in which white women were "publicly gang-raped" by "Negroids."

The argument is that this evidence was highly prejudicial in the sense that it tended to inflame the jury and encourage it to decide other than on the merits; that its probative value in proving the offenses charged was small; and that because its prejudicial impact greatly outweighed its probative value, it should have been excluded under the calculus contained in Fed. R. Evid. 403. The district court's assessment in such a case is reviewed under a highly deferential abuse of discretion standard. United States v. Smith, 292 F.3d 90, 99 (1st Cir. 2002), cert. denied, 538 U.S. 933 (2003).

Unfortunately for the defendants, evidence of their beliefs and associations was highly relevant. Chase scarcely denied counterfeiting but sought to separate herself from the bomb-making enterprise; showing her motive to engage in the latter was thus important to the government's case. And while Felton's involvement in the bomb preparations was obvious, his motive was crucial in establishing that, as required by the statute prohibiting attempted receipt of explosives, 18 U.S.C. § 844(d), his purpose was to kill or injure persons or destroy property.

That defendants' beliefs and associations tended to show such motives is obvious, and the government had no similarly potent, but less prejudicial, means of closing the evidentiary gap.

-8-

The material was certainly inflammatory and its potential for prejudice remained, even though dampened in some measure by the district court's efforts to minimize the risk, primarily by repeated cautionary directions to the jury. But probative value was not "clearly outweighed" by "the danger of unfair prejudice," Fed. R. Evid. 403, and the admission of the evidence was not error at all, let alone so clearly so as to be an abuse of discretion.

The gang-rape passage deserves separate comment. The prosecutor not only introduced a pamphlet containing the language quoted above, but also had a witness read it to the jury until a defense objection was made. It is hard to justify this tactic of isolating and repeating this lurid passage--obviously remote from anything at issue in this case--but the defense objection was immediately sustained. Given the weight of the evidence, it is virtually certain that reading this single passage did not cause the guilty verdicts.

Felton and Chase claim that evidence introduced against them of letters and other statements of Struss, Dellinger, and Reid was inadmissible hearsay. Under the governing rule, the government must prove by a preponderance of the evidence that such out of court statements were from a member of a conspiracy with defendants--not necessarily the one charged--and were made "during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E); see Bourjaily v. United States, 483 U.S. 171, 176

(1987). Proof must go beyond the content of the statements themselves. United States v. Portela, 167 F.3d 687, 703 (1st Cir.), cert. denied, 528 U.S. 917 (1999).

Our review of these essentially factual determinations by the district court is for clear error, Portela, 167 F.3d at 703, and we find none. The contents of the letters, coupled with independent evidence such as Struss' testimony, strongly suggest that all three men played an active role in an unlawful conspiracy with defendants, whether or not the conspiracy extended as far as the one for which defendants were convicted. Struss played a central role in such a conspiracy from his release until his arrest. Dellinger and Reid's support was limited by their imprisonment, but both provided advice and recruitment for the conspiracy from within prison.

Felton's further claim that the introduction of co-conspirators' statements violates the Sixth Amendment is without merit. Under the Supreme Court's decision in Ohio v. Roberts, 448 U.S. 56 (1980), the statements fall within a firmly rooted hearsay exception, so their admission does not violate Felton's Sixth Amendment rights. See id. at 66; see also United States v. Inadi, 475 U.S. 387, 399-400 (1986) (Sixth Amendment does not require

proof of unavailability of declarant for admission of co-conspirator statements).[2]

Separately, Felton claims that the government improperly used the word "terrorist" throughout trial to describe the defendants and their actions.  It is hard to lay down a general rule as to epithet and rhetoric because the considerations are matters of degree: these include accuracy in description, threat of unfair prejudice, frequency of use, and alternative means of description.  Such judgments turn on particular facts, and much latitude has to be given to the trial judge on the spot to strike the proper balance.  See United States v. Tierney, 760 F.2d 382, 388 (1st Cir.), cert. denied, 474 U.S. 843 (1985).

Here, "terrorist" is obviously a provocative term, freighted with images of terrible events.  The defendants were not charged with offenses so labeled, see 18 U.S.C. §§ 2331 et seq., but the jury--ignorant of the contents of such sections and instructed on the elements of the crimes here charged--could not have thought otherwise.  The jurors surely understood the references in their lay sense as summarizing the central conduct

---

[2]As Felton concedes in his opening brief, the statements are nontestimonial--that is, not made with an expectation that they will be used in court.  As such, they are not subject to the latest Supreme Court restriction on the use of out-of-court statements in criminal proceedings.  Crawford v. Washington, 541 U.S. 36, 68 (2004).

with which the defendants were charged: a conspiracy to build a bomb to attack civilian targets to advance an ideological cause.

To describe such plans and the individuals who pursued them as "terrorist" was certainly an accurate lay use of the term "terrorist," and it is not easy to think of some softer description to summarize the gist of what the government's evidence suggested. That the term is highly pejorative is true--but this is a function of the acts that the defendants engaged in, not the government's inaccurate description of those acts. Cf. United States v. Jordan, 223 F.3d 676, 691 (7th Cir. 2000).

Technical accuracy is perhaps not conclusive. One can imagine situations in which an epithet carries connotations well beyond the crime charged (e.g., "murderer" in a case of negligent homicide), or cases in which the description is gratuitously inflammatory, serving no reasonable purpose in summarizing the government's position. But neither fault is present here, and, realistically, the terrorism label can have added little prejudice compared to the evidence of the bomb building itself. Once again, absent egregious circumstances these are matters for the trial judge's judgment.

Finally, as to one of his convictions for violation of the felon in possession statute, 18 U.S.C. § 922(g)(1), Felton claims that the prohibition against possessing firearms in or affecting commerce should be construed to apply to "only those

-12-

firearms whose possession has an actual impact on commerce."
Felton's interpretation is defeated by case law stating that a
firearm's travel in interstate commerce is sufficient to satisfy
the statute.  See, e.g., United States v. Adams, 375 F.3d 108, 113
(1st Cir. 2004); United States v. Colón Osorio, 360 F.3d 48, 53
(1st Cir. 2004); United States v. Weems, 322 F.3d 18, 25-26 (1st
Cir.), cert. denied, 540 U.S. 892 (2003).

This brings us to the government's appeal of the district
court's post-verdict judgment of acquittal.  The charge in question
against both defendants was that they had possessed Chase's Iberia
pistol in furtherance of their conspiracy to make and possess a
destructive device.  We review the sufficiency of the evidence de
novo, in the light most favorable to the jury's finding of guilt.
The district court's acquittal can be upheld only if no reasonable
jury could find the elements of the crime charged beyond a
reasonable doubt.

The provision in question--section 924(c)(1)(A) of the
Criminal Code--is nominally concerned with "penalties" for federal
crimes defined elsewhere, and it provides in pertinent part that a
minimum term (here, "not less than 5 years") applies if the firearm
was possessed "in furtherance of" "any crime of violence or drug
trafficking crime."  In this case, the government's position,

submitted to the jury, was that Chase and Felton possessed Chase's Iberia pistol "in furtherance of" the bomb-making conspiracy.[3]

To support a conviction under section 924(c)(1)(A), the government need not prove that the defendants "actively employed the firearm in furtherance of" the charged crime of violence, but it must prove that the firearm was "possessed to advance or promote the commission of the underlying offense," United States v. Grace, 367 F.3d 29, 35 (1st Cir. 2004); "mere presence of a firearm," it is said, is not enough, id. One question is what the statute and these quoted glosses mean; the other is whether the evidence was sufficient to convict each defendant.

One might expect with such a common criminal offense that the legal framework would be well settled, but, as is so often the case with general statutory terms, it is not. One could argue, in particular, about whether the "in furtherance" requirement refers to subjective purpose or objective potential (or whether either would do). Statutory language, legislative history, model jury

---

[3]Normally, facts pertinent to sentencing are determined by the judge, not the jury, under a preponderance standard; but case law has long treated section 924(c) as a separate criminal offense. Simpson v. United States, 435 U.S. 6, 10 (1978).

instructions and case law do not cleanly resolve the issue,[4] nor

did the instruction given in this case do so explicitly:

> To possess a firearm in furtherance of a crime
> means that the firearm helped to facilitate,
> forward, advance or promote the commission of
> the specific crime charged in Count 1. In
> this case, it is not sufficient for the
> government to prove simply that a defendant
> possessed a firearm during the same time that
> conspiracy to possess a destructive device
> occurred. The government must prove beyond a
> reasonable doubt that the firearm had a
> specific and direct connection to the
> commission of the crime charged in Count 1 in
> order for [this] element to be satisfied.
>
> Some factors you may consider when decid[ing]
> whether either defendant possessed a firearm
> in furtherance of the crime charged in Count 1
> include[] the type of weapon, whether the gun
> was loaded, whether the weapon was stolen, how
> accessible it was to the particular defendant,
> the legality of its possession, and the time
> and the circumstances under which the firearm
> was found.

In practice, the same evidence tends to be relevant

whether the ultimate test is objective furtherance or a subjective

purpose to further.[5] Similarly, in most cases the result will be

---

[4] See H.R. Rep. 105-344, at 11-12 (1997), 1997 WL 668339; 2 Sand et al., Model Federal Jury Instructions, Instructions 35-78, 35-79 & 35-80 (2002). Compare First Circuit Committee on Pattern Criminal Jury Instructions, Pattern Jury Instructions (Criminal Cases), § 4.07 (1998) (either objective or subjective test will satisfy prior version of section 924(c)).

[5] Often--this case is an exception--there is no direct proof of subjective intent; but even without direct proof, subjective intent, if required, could be inferred from the objective circumstances (e.g., the gun laid on the table during the drug transaction). Conversely, even if the test were strictly objective and focused on the firearm's capacity to advance the crime, the

-15-

the same, whichever ultimate test is used.  That appears to be true here, and there being no challenge to the wording of the instruction on this score, we focus upon the sufficiency of the evidence, taking both subjective and objective evidence into account.

Starting with the objective evidence, the pistol in this case was loaded and located in the open in the same room as the fertilizer.  It could easily have been used against any effort, if one had been made by law enforcement, to disrupt the bomb-making or to apprehend the conspirators.  The cases dealing with weapons used in drug dealings regularly uphold "in furtherance" findings based on the weapon's capacity to counter resistance.[6]  Actual use may be more common in drug deals, but there is no requirement that actual use be proved.

Additional evidence as to the defendants' subjective intent supports the view that both Chase and Felton anticipated the use of a firearm in furtherance of the crime.  By Chase's own

---

defendant's confessed purpose to use it would be evidence of feasibility.

[6]See, e.g., United States v. Garner, 338 F.3d 78, 81 (1st Cir.), cert. denied, 540 U.S. 1084 (2003); United States v. Luciano, 329 F.3d 1, 6 & n.9 (1st Cir. 2003); United States v. Timmons, 283 F.3d 1246, 1253 (11th Cir.), cert. denied, 537 U.S. 1004 (2002); United States v. Mackey, 265 F.3d 457, 462-63 (6th Cir. 2001), cert. denied, 534 U.S. 1097 (2002); United States v. Finley, 245 F.3d 199, 203 (2d Cir. 2001), cert. denied, 534 U.S. 1144 (2002); United States v. Ceballos-Torres, 218 F.3d 409, 412-15 (5th Cir. 2000), cert. denied, 531 U.S. 1102 (2001).

admission, to Niemczura, this very pistol was acquired "for her protection from anyone trying to interfere with her plan" with Felton--exploits that she said would earn her and Felton a place in history. References by a defendant to future "plans" can certainly be vague, as the district court said, Chase, 221 F. Supp. 2d at 220-21, but not these references in these circumstances.

As to Felton, even before getting out of prison he sought to acquire a firearm (through his wife), and there is every reason to think that, having lost this gun when Struss took it to New Jersey, he would have used Chase's gun to protect the conspiracy. This is good evidence of subjective intent, regardless of whether Chase's statement to Niemczura was admissible against Felton. To be admissible, the statement need not have been made to a fellow conspirator, compare Chase, 221 F. Supp. 2d at 212, with Fed. R. Evid. 801(d)(2)(E); United States v. Piper, 298 F.3d 47, 53 (1st Cir. 2002), so long as it was made to advance the conspiracy.

In subsequently setting aside the jury's verdict, the district judge invoked the "mere presence" rubric advanced in cases like Grace, see Chase, 221 F. Supp. 2d at 219-20, but this rubric must be understood in relation to Grace's further point that active use is not required. Grace, 367 F.3d at 35. Yes, the unloaded target rifle in the locked gun closet during a drug deal may be "merely present"; but the pistol on the table during the same deal, readily usable to protect the drugs and to intimidate the customer,

-17-

is enough to convict. Thus, "presence" <u>can</u> be enough to convict; and the difference between this and "mere presence" is a matter of degree and circumstances. <u>Cf.</u> <u>United States</u> v. <u>Ortiz</u>, 966 F.2d 707, 712 (1st Cir. 1992), <u>cert. denied</u>, 506 U.S. 1063 (1993).

There is perhaps more force to the district judge's caution that "one can surely speculate how the gun might be used to facilitate the bomb making conspiracy, . . . [but] section 924(c) requires a more specific inquiry." <u>Chase</u>, 221 F. Supp. 2d at 221. Yet the difference between "speculation" and "reasonable inference" is primarily a matter of probabilities, and while a wholly insubstantial likelihood of use could defeat liability (<u>e.g.</u>, the antique gun bolted to the wall), this is not such a case.

The risk created by the defendants' possession of the gun was real enough to permit a jury to convict. Merely as an example, had Struss started to cooperate at an earlier stage, agents might well have apprehended Chase and Felton at their apartment instead of on the street. Furtherance cases generally do turn on "what ifs," so depending on the circumstances a gun held "just in case" may readily support a conviction. <u>Compare</u> <u>Chase</u>, 221 F. Supp. 2d at 218-19. Except in the extreme case, this is the kind of call properly left to the jury.

The district court's analysis of the statute's history serves mainly to confirm that Congress in its most recent revision meant to broaden the statute's coverage. <u>See</u> H.R. Rep. No. 105-

344, at 4-6 (1997), 1997 WL 668339 (explaining the revision as a response to Bailey v. United States, 516 U.S. 137 (1995)). No one can be sure just where Congress intended to draw the line, but this is certainly not the paradigm case of a weapon purchased for some innocent purpose that happened to be stored near the crime. Cf. United States v. Lawrence, 308 F.3d 623, 630-31 (6th Cir. 2002).

The remaining question as to this part of the verdict is whether, as Chase contends, the district court erred by refusing to add to the instruction a further gloss sought by Chase's counsel.[7] Counsel argued that, in addition to the "specific and direct" connection required by the judge's instruction, the judge should also tell the jury that the weapon must be "integral" to the bomb-making conspiracy. The purpose, according to Chase, was to prevent the jury from convicting on the "mere presence" of the weapon.

In most situations, a judge who charges in the terms of the statute--the "in furtherance of" language--has substantial latitude as to whether and how to elaborate. In this instance, the judge went some distance toward Chase's goal by telling the jury specifically that "it is not sufficient for the government to prove

---

[7]Chase also objected to the district court's inclusion of the list of factors the jury could take into account in making its "in furtherance" determination, arguing that the use of such factors--developed in cases involving drug crimes--was inappropriate for non-drug crimes. Yet these fairly general factors--such as whether the gun was loaded and accessible to the defendant--are relevant whatever the crime involved, and certainly do not depend on some exact equation between drug crimes and bomb making.

simply that a defendant possessed a firearm during the same time that [the] conspiracy to possess a destructive device occurred."

Whether the "specific and direct connection" language is a perfect gloss does not matter, for Chase herself endorsed that part of the instruction. As for "integral," it could easily have misled the jury into thinking that the gun had to be central or necessary to the conspiracy, when all that is required for conviction is that the gun be possessed in furtherance of the conspiracy. It would arguably have been error to charge in the fashion sought by Chase; it was certainly not error to refuse to do so.

The convictions entered by the district court are affirmed, the sentences are vacated, and the case is remanded for reinstatement of the conviction of each defendant under section 924(c)(1)(A) and for re-sentencing of each defendant on all counts of conviction applicable to that defendant. Given the remand for resentencing, we need not reach claims of error in guideline calculations urged by Felton.

It is so ordered.