# United States Court of Appeals
## For the First Circuit

No. 03-2333

UNITED STATES OF AMERICA,

Appellee,

v.

EDGARDO SÁNCHEZ-BERRÍOS,

Defendant, Appellant.

_____

No. 03-2334

UNITED STATES OF AMERICA,

Appellee,

v.

JOSÉ COTTO-LATORRE,

Defendant, Appellant.

_____

No. 03-2335

UNITED STATES OF AMERICA,

Appellee,

v.

DAVID CRUZ-PAGÁN,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

---

Before
Boudin, Chief Judge,

Selya, Circuit Judge,

and Siler,[*] Senior Circuit Judge.

---

Juan M. Masini-Soler on brief for appellant Sánchez-Berríos.
Lenore Glaser on brief for appellant Cotto-Latorre.
Alan D. Campbell on brief for appellant Cruz-Pagán.
H.S. Garcia, United States Attorney, Nelson Pérez-Sosa and Lisa Snell-Rivera, Assistant United States Attorneys, on brief for the United States.

---

September 20, 2005

---

[*]Of the Sixth Circuit, sitting by designation.

**SELYA**, **Circuit Judge**. These appeals evolve from a reverse sting operation designed to ferret out police corruption. The defendants, all law enforcement officers who greedily took the bait, were found guilty by a jury on a myriad of charges and thereafter sentenced to lengthy prison terms. In this venue, they variously challenge the district court's stewardship of the trial, their convictions, and their sentences. Concluding, as we do, that their asseverational array lacks merit, we affirm the judgments below.

## I. BACKGROUND

We recount the facts in the light most hospitable to the verdicts, consistent with record support. United States v. Vega Molina, 407 F.3d 511, 516 (1st Cir. 2005).

The central figure in the reverse sting operation that led to the instant convictions is Arturo Ortiz-Colón, himself a corrupt police officer who, after his apprehension in the spring of 2000, began to cooperate with the Federal Bureau of Investigation (FBI) in exchange for leniency. That arrangement resulted in the launching of Operation Honor Perdido (Lost Honor).

In the course of that operation, Ortiz-Colón, posing as a corrupt federal agent, would present opportunities to local police officers to earn money for assisting in the transportation and protection of illegal drugs. The FBI furnished Ortiz-Colón with accouterments suitable to his assumed role, including a luxury

-3-

apartment and a flashy car (both of which were outfitted with recording equipment). His telephone was similarly appointed and he himself wore a body wire when the occasion demanded. Ortiz-Colón found no shortage of local police officers who hastened to trade honor for hard cash. See, e.g., United States v. Villafane-Jimenez, 410 F.3d 74 (1st Cir. 2005) (per curiam) (recounting details of an unrelated Honor Perdido prosecution and conviction); United States v. Vázquez Guadalupe, 407 F.3d 492 (1st Cir. 2005) (same); United States v. Flecha-Maldonado, 373 F.3d 170 (1st Cir. 2004) (same).

Diana Díaz, herself a corrupt police officer who had bought into Ortiz-Colón's charade, functioned as his "recruiter." At various times, she approached defendant-appellant Edgardo Sánchez-Berríos (Sánchez), defendant-appellant José Cotto-Latorre (Cotto), and defendant-appellant David Cruz-Pagán (Cruz). Each of them was enlisted to participate in a different drug transport. The details follow.

After Díaz initially contacted Sánchez, Ortiz-Colón hired him to act as an escort for a drug delivery scheduled to take place in November of 2000. Sánchez, driving Díaz's car, accompanied the transport vehicle to a shopping plaza where the drugs were transferred to another vehicle. Ortiz-Colón paid Sánchez $5,000 for his services.

-4-

When Díaz approached Cotto, he too indicated a willingness to participate in drug deals. She took him and other police officers whom she had recruited to Ortiz-Colón's apartment. The group discussed a transport projected to take place in April of 2001. At that meeting, Ortiz-Colón explained that he was working for a Colombian drug dealer (El Viejo) and that the officers would be expected to escort and unload an incoming shipment of cocaine while pretending that they were raiding the boat on which it arrived. The "raiding party" would then deliver the cocaine to El Viejo and be paid for their services. Ortiz-Colón offered the assembled officers an opportunity to opt out; Cotto not only chose to stay, but also volunteered to recruit other police officers to swell the coconspirators' ranks.

On the day of the transport, Cotto, wearing his uniform shirt and carrying his official firearm, rode with Ortiz-Colón to a marina. He helped to off-load the cocaine, stow it in Ortiz-Colón's car, and ferry it to Ortiz-Colón's apartment. Ortiz-Colón paid Cotto $5,000 for services rendered.

Díaz also recruited Cruz and arranged an audience for him with Ortiz-Colón. Cruz agreed to participate in a drug transport that occurred in May of 2001. During that incident, Cruz carried his firearm and helped to move cocaine from one vehicle to another. Ortiz-Colón later paid him $5,000 for his help.

The three appellants, along with Díaz and twelve other individuals, were eventually indicted by a federal grand jury sitting in the District of Puerto Rico. Pertinently, count 1 of the second superseding indictment charged the sixteen named defendants, including all three appellants, with conspiracy to distribute more than five kilograms of cocaine. See 21 U.S.C. §§ 841, 846. Count 2 charged Sánchez with attempting to distribute more than five kilograms of cocaine while aiding and abetting others. See 18 U.S.C. § 2; 21 U.S.C. § 841. Counts 5 and 6 levied the same charge against Cotto and Cruz, respectively. Count 8 charged each of the three appellants, among others, with carrying a firearm during and in furtherance of a drug-trafficking offense. See 18 U.S.C. § 924©).

After a twelve-day trial, the jury convicted Sánchez on counts 1 and 2, Cotto on counts 1, 5, and 8, and Cruz on counts 1, 6, and 8. The district court sentenced Sánchez to 151 months of imprisonment and a five-year supervised release term; Cotto to 188 months of imprisonment on the drug-trafficking charges, a consecutive five-year incarcerative term on the weapons count, and eight years of supervised release; and Cruz to 151 months of imprisonment on the drug-trafficking charges, a consecutive five-year incarcerative term on the weapons count, and eight years of supervised release. These appeals ensued.

-6-

## II.  ANALYSIS

The appellants advance a gallimaufry of challenges to their convictions and sentences.  We discuss this panoply of issues along a quasi-chronological continuum that stretches from trial to sentencing.

### A.  **Prosecutorial Misconduct**.

Cotto argues that improper prosecutorial comments entitle him to a new trial.  His challenge encompasses a variety of word choices made throughout the proceedings.  He castigates (i) the prosecutor's reference, in the opening statement, to "Honor Perdido"; (ii) the prosecutor's eliciting of testimony from an FBI agent, Jeffrey Paleaz, that the FBI used sham cocaine in the reverse sting operation because it "did not trust" the targeted police officers with real cocaine; (iii) the prosecutor's repeated invocation of the term "corrupt officers"; and (iv) the prosecutor's allusion, in closing argument, to the defense attorneys' explanation of what had occurred as a "self serving absurdity."

Because Cotto interposed no contemporaneous objections to any of these word choices, we review his claim of prosecutorial misconduct under the plain error rubric.  "Review for plain error entails four showings:  (1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness,

-7-

integrity, or public reputation of judicial proceedings." <u>United States</u> v. <u>Duarte</u>, 246 F.3d 56, 60 (1st Cir. 2001). If an assignment of error fails to pass through any of these four screens, it is not a basis for reversal. <u>See</u> <u>id.</u> Consequently, a party who neglects to call a looming error to the trial court's attention acts at his peril; under plain error review, we have leeway to correct only the most egregious of unpreserved errors. <u>See</u> <u>United States</u> v. <u>Taylor</u>, 54 F.3d 967, 972 (1st Cir. 1995) (explaining that "[t]he plain error doctrine concentrates on 'blockbusters'" (quoting <u>United States</u> v. <u>Griffin</u>, 818 F.2d 97, 100 (1st Cir. 1987))).

None of the statements singled out by Cotto was improper. "Honor Perdido" was the appellation assigned to the sting operation and, thus, was a background fact of the case. The agent's testimony, which explained why no actual drugs were in evidence, falls into the same classification. The prosecutor's description of the defense as a "self serving absurdity," while not flattering, was fair argument. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Bennett</u>, 75 F.3d 40, 46-47 (1st Cir. 1996) (holding that prosecutor's comment that the defense argument was a "'diversion' that does not 'pass the laugh test'" did not "cross[] the line"); <u>United States</u> v. <u>Sblendorio</u>, 830 F.2d 1382, 1395 (7th Cir. 1987) ("Counsel represent many people with lame defenses; the prosecutor [is] entitled to say that the defenses [are] lame . . . .").

-8-

The references to "corrupt officers" present a marginally closer call. Mischaracterization or overuse of a potentially inflammatory phrase may in some exaggerated circumstances be deemed prejudicial. As we said in United States v. Felton, 417 F.3d 97, 103 (1st Cir. 2005), "[o]ne can imagine situations in which an epithet carries connotations well beyond the crime charged . . . or cases in which [a] description is gratuitously inflammatory, serving no reasonable purpose in summarizing the government's position." Here, however, the evidence justified the descriptive term[1] and the manner and frequency of the prosecutor's usage of it was not excessive. Moreover, the trial judge's instructions safeguarded against the possibility of unfair prejudice. See Taylor, 54 F.3d at 977. In these circumstances, we discern nothing approximating plain error.

### B. **Admission of Hearsay Evidence**.

Cotto challenges the admission of an audiotaped conversation between Díaz and Ortiz-Colón, in which Díaz described her initial encounter with Cotto, opined that he had been involved in drug escorts before, and recounted his enthusiasm for the task. Díaz did not testify at trial. Building on this foundation, Cotto

---

[1]Virtually all of Cotto's participation in the drug transport was recorded and presented to the jury by videotape and audiotape. Given this nearly irrefutable evidence of Cotto's guilt and his heroic (if unsuccessful) efforts to mount an entrapment defense, see infra Part II(C), it cannot sensibly be said that describing him as a "corrupt officer" so poisoned the well as to require reversal here.

makes two arguments against the admission of this conversation. First, he maintains that it did not fall under any exception to the hearsay rule. Second, he asseverates that its admission violated his right to confrontation.

There is a threshold issue here — an issue that involves the distinction between waiver and forfeiture. We have limned that distinction in the following terms:

> A party waives a right when he intentionally relinquishes or abandons it. This is to be distinguished from a situation in which a party fails to make a timely assertion of a right — what courts typically call a "forfeiture." The difference is critical: a waived issue ordinarily cannot be resurrected on appeal, whereas a forfeited issue may be reviewed for plain error.

United States v. Rodriguez, 311 F.3d 435, 437 (1st Cir. 2002) (citations omitted). Although there was no explicit waiver here, the government asserts that we should not review this challenge because the hearsay issue was so obvious that the defense's failure to object constituted a waiver.

This argument is unavailing. In the absence of extraordinary circumstances, see, e.g., United States v. Houlihan, 92 F.3d 1271, 1281 (1st Cir. 1996) (finding that defendants had waived right to raise hearsay objections by murdering the potential witness) — and none are present here — a party who does not object to an evidentiary ruling has forfeited his claim of error, not waived it. See Fed. R. Evid. 103(d); see also Chestnut v. City of

Lowell, 305 F.3d 18, 20 (1st Cir. 2002) (en banc) (per curiam).  We thus review the lower court's admission of the challenged conversation for plain error.  See Chestnut, 305 F.3d at 20.

The Federal Rules of Evidence exclude from the definition of hearsay "statement[s] by a coconspirator of a party [made] during the course and in furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E).  When uttered in furtherance of the mission of an ongoing conspiracy, such statements are outside the purview of the hearsay bar.  See Krulewitch v. United States, 336 U.S. 440, 443 (1949); United States v. Sepulveda, 15 F.3d 1161, 1180 (1st Cir. 1993).[2]

Cotto posits that Díaz's statement — that is the only portion of the conversation with which we are concerned, as Ortiz-Colón testified at the trial — does not fall under this exemption because it was made before he had joined the conspiracy and, thus, before he and Díaz could be considered coconspirators.  Yet it is clear from Díaz's statement, as well as from Cotto's subsequent account of the conversation (recorded in the course of the sting and admitted into evidence without objection), that Cotto agreed to join the conspiracy when he and Díaz first spoke.  Although Cotto

---

[2]Although the Federal Rules of Evidence treat coconspirator statements as exemptions from the hearsay rule and Supreme Court jurisprudence treats them as exceptions to that rule, see Krulewitch, 336 U.S. at 443, this difference in nomenclature is immaterial.  See United States v. Inadi, 475 U.S. 387, 399 n.12 (1986).

-11-

did not know the precise details of the plan until he met with Ortiz-Colón, he understood both his role and the role of others in the illicit activity. No more was exigible. Cf. United States v. O'Campo, 973 F.2d 1015, 1019 (1st Cir. 1992) (holding that "the government need not establish that the [members] knew or agreed upon every detail of the conspiracy," but only "the essential nature of the plan and their connections with it" (citation and internal quotation marks omitted)); United States v. Baines, 812 F.2d 41, 42 (1st Cir. 1987) ("[A] conspiracy is like a train. When a party knowingly steps aboard, he is part of the crew, and assumes conspirator's responsibility for the existing freight — or conduct — regardless of whether he is aware of just what it is composed.").

In all events, Díaz's statement unarguably was made in furtherance of the conspiracy as it tended to promote one or more of the objects of the conspiracy. See United States v. Piper, 298 F.3d 47, 54 (1st Cir. 2002). Díaz was reporting the progress of her recruitment efforts to the ringleader. This was obviously an integral element of the phantom drug-trafficking operation. The audiotape thus falls squarely within the coconspirator exemption to the hearsay rule and the district court did not err in admitting it on that ground.

Cotto's Confrontation Clause challenge is similarly unpersuasive. In mounting this challenge, Cotto invokes Crawford v. Washington, 541 U.S. 36 (2004), in which the Supreme Court held

-12-

that the admission of testimonial statements, without any opportunity for cross-examination, amounted to a Sixth Amendment violation. Id. at 68. That decision, however, explicitly recognized that statements made in furtherance of a conspiracy "by their nature [are] not testimonial." Id. at 56. The introduction of Díaz's statement, therefore, does not constitute a Sixth Amendment violation despite the lack of any opportunity for cross-examination. See Felton, 417 F.3d at 103 (holding that the introduction of a coconspirator statement did not abridge the defendant's Sixth Amendment rights because the statement fell within a firmly rooted hearsay exception and was nontestimonial); see also United States v. Inadi, 475 U.S. 387, 399-400 (1986) (holding that the Sixth Amendment does not require an unavailability rule for the admission of coconspirator statements).

Nor does the admission of Díaz's statement infract the Constitution by virtue of the rule announced in Bruton v. United States, 391 U.S. 123 (1968). Bruton held that a Sixth Amendment violation occurs when a court, at a joint trial, admits one defendant's confession, which implicates the other defendant, without the opportunity for cross-examination. Id. at 137. The Court was careful not to take a position on whether the outcome would have been different had the confession been admitted under a hearsay exception. See id. at 128 n.3. We have answered this question, holding unequivocally that "there is no Bruton problem"

when a "statement falls within the coconspirator exception to the hearsay rule." United States v. Arruda, 715 F.2d 671, 685 n.11 (1st Cir. 1983).

For these reasons, the admission of the audiotape was entirely proper.[3]

## C.  Entrapment.

We next examine Cotto's claim that the district court improperly refused to instruct the jury on entrapment. Because Cotto objected to this refusal at trial, we review his assignment of error de novo. United States v. Rodriguez, 858 F.2d 809, 812 (1st Cir. 1988).

Two elements comprise the defense of entrapment:  "(1) government inducement of the accused to engage in criminal conduct, and (2) the accused's lack of predisposition to engage in such conduct." Id. Only when the accused satisfies an entry-level burden of production as to both elements is the government put to its burden of proving beyond a reasonable doubt that no entrapment occurred. See id. at 814-15. By like token, unless and until a defendant carries his entry-level burden, he is not entitled to an instruction on an entrapment defense. Id. at 814. To clear this hurdle, he must supply "evidence which fairly supports the claims

---

[3]If more were needed — and we do not think that it is — we note that the bulk of what transpired at Cotto's initial meeting with Díaz was rehearsed by Cotto himself in a later taped conversation. That conversation was admitted at trial and its admission is not challenged on appeal.

of both government inducement of the crime and [his own] lack of predisposition to engage in it." Id.

In this instance, Cotto plainly failed to carry his entry-level burden as to improper inducement.[4] In his appellate brief, Cotto makes no meaningful effort to direct us to record evidence of any improper inducement, but, rather, contents himself with sweeping generalities (e.g., that the government had gone "to extraordinary lengths to create a fiction," suggested that there would be "reprisals if [Cotto] declined to join," and exploited "the psychological pressure of the authority of higher ranked officers [to overwhelm] any resistance"). The record offers no support for these generalities. To the contrary, recorded meetings show beyond hope of contradiction that Cotto was eager to avail himself of the proffered drug-escort opportunities. The only inducement that the record reflects is a chance to make money — and holding out the prospect of illicit gain is not the sort of government inducement that can pave the way for an entrapment defense. See United States v. Coady, 809 F.2d 119, 122 (1st Cir. 1987) (explaining that entrapment does not exist merely because "a person succumbs to his own greed or to the lure of easy money"); see also United States v. Gifford, 17 F.3d 462, 468 (1st Cir. 1994)

---

[4]Because this failure, in and of itself, justified the district court's refusal to charge the jury on entrapment, see Rodriquez, 858 F.2d at 814, we need not dwell on the evidence of predisposition.

-15-

("Neither mere solicitation nor the creation of opportunities to commit an offense comprises inducement.").

That ends this aspect of the matter. Since Cotto provided no evidence of improper inducement adequate to satisfy his entry-level burden of production, the district court's decision to withhold an entrapment instruction cannot be faulted.

## D. **Sufficiency of the Evidence**.

Sánchez and Cotto both challenge the district court's denial of their motions for judgment of acquittal. See Fed. R. Crim. P. 29. We ordinarily review the denial of such motions de novo, asking "whether the evidence, construed favorably to the government, permitted rational jurors to conclude, beyond a reasonable doubt, that the defendant was guilty as charged." United States v. Sebaggala, 256 F.3d 59, 63 (1st Cir. 2001). The government can supply a satisfactory answer to this question through either direct or circumstantial evidence, or through any combination thereof. United States v. Santiago, 83 F.3d 20, 23 (1st Cir. 1996).

Sánchez claims that the government did not present sufficient evidence to prove the intent necessary for a conspiracy conviction. Without ever using the word "entrapment," he employs the essentials of that construct to argue that the district court

should have found entrapment as a matter of law.[5]  We reject his importunings.

To defeat a sufficiency challenge premised on a defense of entrapment, the evidence, taken in the light most favorable to the government, need only support a finding of either predisposition or lack of improper inducement.  See Rodriguez, 858 F.2d at 814.  The record in this case contains ample evidence on both points.

A discussion of lack of any improper inducement would substantially replicate what we already have written in relation to Cotto.  See supra Part II©).  As to predisposition, we note that Sánchez's involvement in the drug escort was recorded and presented to the jury.  Among other things, the jurors heard Sánchez being told, over and over again, that he did not have to participate in the venture.  The jurors also heard Sánchez state that he was not worried about doing something that he knew was illegal; he was worried only about the possibility of being caught.  From this and other evidence, it is abundantly clear that the government provided enough proof for a rational jury to conclude, beyond a reasonable doubt, that Sánchez was predisposed to commit the crime (and, therefore, was not entrapped).

_____

[5]Had Sánchez raised this challenge in connection with the jury instructions (as did Cotto, see supra Part II(C)), he would have encountered a more appellant-friendly scenario.  In either guise, however, the challenge would fail.

Cotto's Rule 29 challenge takes a different tack. He jettisons his entrapment argument at this juncture in favor of an argument that he was entitled to judgment as a matter of law on the weapons count because the government used sham cocaine in the underlying transport operation. Therefore, his thesis runs, his firearm could not have been used "in furtherance of" any drug-related crime.

The first flaw in this line of argument is that Cotto did not pursue it below. Since this particular theory of insufficiency was not preserved, our review is limited to the prevention of clear and gross injustice.[6] Santiago, 83 F.3d at 23.

The evidence here is palpably sufficient to support the weapons count. The statute of conviction applies to "any person who, during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted . . . , uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." 18 U.S.C. § 924(c)(1)(A). The government brought the charge against Cotto in conjunction with the conspiracy count. A culpable conspiracy may exist even though the

_____

[6]It is unclear from our precedents whether this standard is simply a gloss on plain error review, see, e.g., United States v. Peña-Lora, 225 F.3d 17, 26 (1st Cir. 2000) (combining the two tests), or a more stringent standard all its own, see United States v. Luciano, 329 F.3d 1, 5 & n.6 (1st Cir. 2003) (noting that "we have generally avoided framing the review of unpreserved insufficiency claims in terms of 'plain error'" and collecting cases). It is unnecessary for us to clarify this point today as Cotto's claim would not succeed under either version.

-18-

conspirators misapprehend certain facts. United States v. Waldron, 590 F.2d 33, 34 (1st Cir. 1979). A conspiracy to traffic in controlled substances, punishable under 21 U.S.C. § 846, is itself a drug-trafficking crime and may serve as a predicate offense for purposes of 18 U.S.C. § 924(c). See United States v. Meggett, 875 F.2d 24, 27 (2d Cir. 1989). While the substantive crime that is the object of the conspiracy may be impossible to achieve, the conspiracy nonetheless qualifies as an offense for which a person may be prosecuted. See Waldron, 590 F.2d at 34.

That conclusion leads to game, set, and match. If the use of sham cocaine has no effect on the underlying conspiracy charge, then a fortiori, it has no effect on the weapons charge in this case.

Without a showing that the weapons count failed as a matter of law, Cotto's sufficiency challenge fizzles. Videotaped evidence showed Cotto with his firearm during the drug transport and additional testimony confirmed that he had his firearm with him during the commission of the crime. That evidence is certainly enough to allow a rational jury to conclude — as this jury did — that Cotto was guilty as charged on the weapons count.

### E. Sentencing Factor Manipulation.

Both Sánchez and Cotto accuse the government of improper sentencing factor manipulation. These accusations have different focal points: Sánchez asserts that the government manipulated the

quantity of drugs that he handled in order to hike his base offense level under the federal sentencing guidelines, see USSG §2D1.1, whereas Cotto asserts that the government connived to have him carry his firearm in order to assure a consecutive five-year sentence under 18 U.S.C. § 924(c)(1)(A)(i). Neither Sánchez nor Cotto raised the issue of sentencing factor manipulation in the lower court, so our review is at best restricted to plain error.[7]

Assuming, favorably to the appellants, that these arguments were merely forfeited rather then waived, we discern no plain error. Impermissible sentencing factor manipulation can justify a downward departure from the sentencing guidelines (or from any applicable statutory minimum). See Villafane-Jimenez, 410 F.3d at 87; United States v. Connell, 960 F.2d 191, 194 (1st Cir. 1992). Withal, such manipulation occurs only when the authorities "venture outside the scope of legitimate investigation and engage in extraordinary misconduct that improperly enlarges the scope or scale of the crime." United States v. Barbour, 393 F.3d 82, 86 (1st Cir. 2004). The facts in this case do not show anything beyond the level of manipulation inherent in virtually any sting

---

[7]We say "at best" because it is arguable that both appellants waived the issue. Counsel for Sánchez stated at his sentencing hearing that he was not making a request for a downward departure, although he recognized the court's authority to depart. Counsel for Cotto stated that "[he didn't] think" that the case "qualifie[d] for sentencing entrapment."

operation — and that is not enough to warrant a downward departure. See Connell, 960 F.2d at 194.

We need not linger long over this point. The record makes manifest that the government did not lure the appellants into committing crimes more heinous than they were predisposed to commit. Rather, it fashioned a series of scenarios that fell well within the bounds of the crimes that the appellants indicated they were prepared to perpetrate. See id. at 196. Both the amount of drugs that Sánchez would transport and Cotto's agreement to carry a firearm were part of the initial plans and remained consistent throughout the operation. Nothing about those stipulations would raise the eyebrow of an impartial observer.

In short, the record reflects no impermissible sentencing factor manipulation here.

### F. **Acceptance of Responsibility**.

Cotto argues that he should have received a two-level reduction in his base offense level for acceptance of responsibility. See USSG §3E1.1. Because he raises this issue for the first time on appeal, our review is for plain error. See United States v. Carrasco-Mateo, 389 F.3d 239, 243 (1st Cir. 2004). We find no error here, plain or otherwise.

An acceptance of responsibility adjustment ordinarily "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements

of guilt, is convicted, and only then admits guilt and expresses remorse." USSG §3E1.1, cmt. (n.2). There are, however, "rare situations" in which "a defendant may clearly demonstrate an acceptance of responsibility . . . even though he exercises his constitutional right to trial." Id. Cotto attempts to fit himself within the narrow confines of this exception by professing that he went to trial only to establish a defense of entrapment — not to contest his factual guilt.

We do not rule out the possibility that, in some odd circumstances, a defendant who goes to trial solely to test the merits of an entrapment defense might nonetheless remain eligible for an acceptance of responsibility adjustment. Here, however, Cotto's claim of entrapment was so weak that it did not even reach the jury. Given his election to put the government to its proof at trial in order to explore so asthenic a defense, there is no principled way that we can set aside the trial court's discretionary refusal to discount his sentence for acceptance of responsibility.

### G. **Booker Error**.

Cotto and Cruz ask that their cases be remanded for resentencing in light of the Supreme Court's recent decision in United States v. Booker, 125 S. Ct. 738 (2005). Because neither appellant preserved a claim of Booker error below, we review for plain error. See United States v. Guzmán, ___ F.3d ___, ___ (1st

-22-

Cir. 2005) [No. 04-1888, slip op. at 9]; <u>United States</u> v. <u>Antonakopoulos</u>, 399 F.3d 68, 75 (1st Cir. 2005).

In its sentencing determinations, the district court treated the sentencing guidelines as mandatory. As to Cotto, the court started with a base offense level of 34, <u>see</u> USSG §2D1.1, to which it added two levels for abuse of a position of trust, <u>see</u> <u>id.</u> §3B1.3. A total offense level of 36, combined with the absence of any relevant criminal history, yielded a guideline sentencing range (GSR) of 188-235 months for the drug-trafficking counts. The court imposed a 188-month sentence on those counts.

As to Cruz, the district court began with a base offense level of 32, <u>see</u> <u>id.</u> §2D1.1, and added two levels for abuse of a position of trust, <u>see</u> <u>id.</u> §3B1.3. A total offense level of 34, combined with the absence of any relevant criminal history, resulted in a GSR of 151-181 months for the drug-trafficking counts. The court imposed a 151-month sentence on those counts.[8]

Because the court treated the sentencing guidelines as mandatory, the appellants have satisfied the first two prongs of the plain error test. <u>See</u> <u>Antonakopoulos</u>, 399 F.3d at 75. The

---

[8]Both Cotto and Cruz were convicted on weapons counts that carried a statutory five-year mandatory minimum, to be imposed consecutively to their sentences on the drug-trafficking counts. <u>See</u> 18 U.S.C. § 924(c)(1)(A)(i). Because that portion of the sentences was driven by statute, not by the guidelines, the claim of <u>Booker</u> error does not reach those counts. <u>See</u> <u>Antonakopoulos</u>, 399 F.3d at 75 ("A mandatory minimum sentence imposed as required by a statute based on facts found by a jury or admitted by a defendant is not a candidate for <u>Booker</u> error.").

third prong requires us to ask whether either or both of the appellants have pointed to circumstances that create a reasonable probability that the district court would have imposed a more lenient sentence had the guidelines been advisory.  See id.  We conclude that they have not.

It is not enough for a defendant merely to argue that his sentence might have been different had the guidelines been advisory at the time of sentencing.  Guzmán, ___ F.3d at ___ [slip op. at 11].  By the same token, an unadorned claim that the judge — and not the jury — found sentencing facts, even if true, does not warrant resentencing.  United States v. Martins, 413 F.3d 139, 152 (1st Cir. 2005).  Rather, the defendant must point to specific indicia of a reasonable probability of a more favorable outcome, see Guzmán, ___ F.3d at ___ [slip op. at 11] — a burden that is tempered by our acknowledgment that, in this sort of situation, we will not be "overly demanding as to proof of probability."  United States v. Heldeman, 402 F.3d 220, 224 (1st Cir. 2005).

Cruz argues broadly that his sentence was "unreasonable," but he declined our invitation to submit supplemental briefing in the wake of the Booker and Antonakopoulos decisions.  The only specific item to which he adverts is the fact that he was sentenced at the bottom of the GSR.  That fact, standing alone, is manifestly

insufficient to satisfy the third element of the plain error test.[9] See Guzmán, ___ F.3d at ___ [slip op. at 12]; United States v. Serrano-Beauvaix, 400 F.3d 50, 55 (1st Cir. 2005).

Cotto, too, cites the fact that the court sentenced him at the low end of the GSR. Apart from that, however, his supplemental brief consists mainly of a diatribe exhorting us to scrap our plain error framework and adopt a rebuttable presumption of prejudice for unpreserved Booker errors. See, e.g., United States v. Barnett, 398 F.3d 516, 527-28 (6th Cir. 2005). We consistently have declined to alter our approach in this way. See Guzmán, ___ F.3d at ___ [slip op. at 8] (citing Eulitt v. Me., Dep't of Educ., 386 F.3d 344, 349 (1st Cir. 2004), for the proposition that, in a multi-panel circuit, panels are bound by prior panel decision closely on point).

To say more on this topic would be supererogatory. There is simply no warrant here for a Booker remand.

### H. **Delegation of Sentencing Authority**.

As a final matter, Sánchez and Cruz assert that the district court improperly delegated its sentencing authority when it imposed a supervised release condition that allowed a probation

---

[9]Within his claim of Booker error, Cruz inserts a conclusory assertion that the court improperly computed his GSR under the sentencing guidelines. Because he does not sufficiently develop this assertion as an independent argument or assignment of error, we deem it abandoned. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

officer to determine the number of drug tests that would be conducted during their respective periods of supervised release and to decide what should happen if either tested positive (that is, whether enrollment in a substance abuse treatment program would be required).[10]  Because neither Sánchez nor Cruz objected to the supervised release conditions at sentencing, their current objections engender plain error review.  United States v. Padilla, 415 F.3d 211, 218 (1st Cir. 2005) (en banc).

There is a procedural twist.  The government confessed error on both points in its brief and indicated that it would acquiesce in a remand.  A concession by either party in a criminal case as to a legal conclusion is not binding on an appellate court. See United States v. Daas, 198 F.3d 1167, 1178 n.14 (9th Cir. 1999).  Here, the government's concessions rested on our decision in United States v. Meléndez-Santana, 353 F.3d 93, 102-06 (1st Cir. 2003) — a decision that has since been overruled in relevant part. See Padilla, 415 F.3d at 215.  Given these unusual circumstances, we will not hold the government to its concessions, but, rather,

---

[10]The supervised release condition requires that Sánchez and Cruz each
submit to a drug test within fifteen (15) days of release on supervised release, and at least two (2) tests thereafter when so requested by the U.S. Probation Officer. If any such samples detect substance abuse, the defendant, at the discretion of the U.S. Probation Officer, shall participate in a substance abuse treatment program, arranged and approved by the U.S. Probation Officer . . . .

will examine the issues afresh. See, e.g., United States v. Resendiz-Patino, ___ F.3d ___, ___ (10th Cir. 2005) [No. 03-2191, slip op. at 10] (disregarding concession when government was "too quick to concede the point").

To begin, we acknowledge that the sentencing court erred in structuring the disputed supervised release condition vis-à-vis the number of drug tests. In Meléndez-Santana, we held, as to the first disputed condition, that a sentencing court's delegation of discretion to a probation officer to determine the number of drug tests that a defendant must undergo, without capping that number, constituted a delegation error. 353 F.3d at 102-06 (citing 18 U.S.C. § 3583(d)). The en banc decision in Padilla left intact that holding and, thus, the error satisfies the first two prongs of the plain error test. See Padilla, 415 F.3d at 217-18.

However, we overruled the "automatic reversal" rule of Meléndez-Santana and substituted conventional plain error review. See id. at 219-20. Upon undertaking that analysis, we held that the delegation error neither affected the defendant's substantial rights nor seriously impugned the integrity of the judicial proceedings. Id. at 220-23. Thus, the error did not warrant correction. Id. at 224.

For essentially the same reasons, we find no reversible error here. For Sánchez and Cruz to show that their supervised release conditions affected their substantial rights, they must

-27-

point to "circumstances indicating a reasonable probability that the trial court, but for the error, would have imposed a different, more favorable sentence." Id. at 221 (citing Antonakopoulos, 399 F.3d at 75). As to the number of drug tests, this showing is "nearly impossible" because we can neither know what limit the trial court would have set on drug testing nor know the number of tests the probation officer will prescribe. Id. A fortiori, there is no reasonable probability that, but for the delegation error, the supervised release conditions would have operated more favorably.

To cinch matters, the delegation error vis-à-vis the number of drug tests is, as in Padilla, "simply not of such magnitude or consequence that it would undermine faith in the judicial system were it to stand uncorrected." Id. That the authority to cap the number of drug tests lies with a judge and not a probation officer reflects a legislative choice, not a constitutionally grounded right. See id. at 222. In addition, the error's effects are limited by statute: should the probation officer require an inordinate number of tests, a defendant is free to invoke 18 U.S.C. § 3583(e)(2), which permits a court to modify the conditions of supervised release at any time. See Padilla, 415 F.3d at 223.

This leaves the condition that gives the probation officer discretion to place a defendant in a substance abuse

-28-

treatment program.  Although the Padilla court did not specifically address that exact condition, its reasoning and result extend to it.  We continue to recognize that the treatment condition constitutes a delegation error.  See Meléndez-Santana, 353 F.3d at 101.  We find, however, that the error fails the third and fourth prongs of the plain error test.

We will not tarry.  Suffice it to say that we encounter grave uncertainty in attempting to divine whether the sentencing court would be more or less likely to require substance abuse treatment than the probation officer, so the error cannot be said to affect substantial rights.  See Padilla, 415 F.3d at 221.  Moreover, the authority of the court to impose the treatment condition derives from a policy choice memorialized in the sentencing guidelines, not from any sort of fundamental interest in fairness.  See USSG §5D1.3(d)(4) (allowing the sentencing court to include "a [supervised release] condition requiring the defendant to participate in a program . . . for substance abuse").  Thus, allowing the probation officer, as opposed to the court, to make the determination does not call into question the integrity of the proceedings.  See Padilla, 415 F.3d at 222.

The bottom line is that we should not waste scarce judicial resources "by seeking to rescue forfeited errors of no importance, encouraging more such claims and more wasted time in the future."  Id. at 225 (Boudin, C.J., concurring).  A remand in

-29-

this case to correct the modest imperfections in the supervised release conditions would be "a theft of [judicial] time from cases where the dispute really matters." Id. We must respect the procedural constraints of plain error review and take a practical, common sense approach to determining which few forfeited errors merit correction.

## III. CONCLUSION

We need go no further. For the reasons elucidated above, we conclude that the appellants were fairly tried, appropriately convicted, and lawfully sentenced. Their appeals are, therefore, impuissant.

**Affirmed**.