Leo V. FELTON, Plaintiff,

v.

Charles B. LINCOLN, Director of Security at PCCF; Richard Cardinal, Disciplinary Hearing Officer at PCCF; Brian Gillen, Deputy Superintendent of PCCF, and Sheriff Joseph McDonough, Superintendent of PCCF, Defendants.

No. CIV.A.02–10944 NG.

United States District Court, D. Massachusetts.

March 17, 2006.

Patrick C. Lee, Plymouth County Sheriff's Department, Steven M. Walsh, Plymouth County Sheriff's Department, Plymouth, MA, for Brian Gillen, Charles B. Lincoln, Joseph McDonough, Richard Cardinal, Defendants.

GERTNER, District Judge.

3/17/06 Judge Nancy Gertner: Electronic Order entered; Order Adopting Report and Recommendations for [54] Report and Recommendations Allowing [43] Motion to Dismiss, Motion for Summary Judgment filed by Brian Gillen, Richard Cardinal, Joseph McDonough, Charles B. Lincoln and Denying [49] Motion for Judgment on the Pleadings filed by Leo Felton. Plaintiff first takes issue with Magistrate Judge Dein's description of plaintiff as an "avowed white supremacist," a characterization that plaintiff finds to be both inaccurate and prejudicial. The Court notes that the Magistrate was merely citing a characterization used by the First Circuit in *United States v. Felton,* 417 F.3d 97, 99 (1st Cir.2005), and that whether or not this remark was accurate, it was entirely extraneous to this Court's review of the present action. Plaintiff next objects to the Magistrate's construction of his due process claims, asserting that the Magistrate failed to understand that plaintiff was not objecting to being denied meaningful access to the courts, but to being punished for the possession of legitimate legal materials which he was entitled to possess. This objection ignores the Magistrate's explanation that "Felton contends that he was wrongfully disciplined because of his possession of discovery material in his cell. Again, Felton has failed to identify the constitutional basis for this claim, although he is presumably raising a due process challenge. Moreover, as a factual matter the record does not support his contention." Report and Recommendation at 21. Magistrate Dein specifically finds, and this Court agrees, that the Record does not support plaintiff's argument that he was punished for possessing legal materials. Plaintiff cites to his Opposition to Defendants' Renewed Motion to Dismiss or for Summary Judgment, claiming that the attachments to his motion demonstrate the truth of his claim. They do not. The disciplinary report attached as Exhibit 4 cites multiple bases for plaintiff's disciplinary sanctions, first and foremost noting defendant's "use and abuse of attorney client markings and labels." The report also notes that plaintiff had "received and desseminated [sic] material which encourage [sic] the use of physical violence" and "violated the PCCF policy on prohibition of inmate to inmate correspondence." Plaintiff notes that defendants, in response to an interrogatory, describe the materials which encourage violence as including "Brochure showing gang signs, gang-related information, activities and nudity. Also, FireQuest Shooting Equipment and Ammunitions [sic] catalog." While the FireQuest catalog was discovery material legitimately in plaintiff's possession, it is only a small part of the report. A significant part of the report was the testimony from Director Lincoln that plaintiff "wasn't disciplined for the material sent to him by his attorney, he was disciplined for forging his attorney's label and then falsely labeling personal mail as legal mail." Compl. Ex. 5 P. 6(c). In short, there is substantial, unrefuted evidence that plaintiff did forge his attorney's label and falsely label personal mail as legal mail; plaintiff has provided no evidence that the punishment was instead related to his possession of legal materials.

Lastly, plaintiff contends that the averments in his motion to amend must be admitted because defendants did not offer an opposition. In support of this contention, plaintiff directs the Court to a May 20, 2005 ruling by Magistrate Judge Dein in which she grants plaintiff's motion to amend, noting, "There being no opposition, the motion is allowed." However, as defendants rightly explain, the lack of opposition referenced by Judge Dein was a lack of opposition to the Motion to Amend, not to the substantive allegations in the complaint. Defendants' decision not to oppose the motion to amend has no implications for their position regarding the substantive contents of the amended complaint subsequently filed by plaintiff. Plaintiff's objections fail to cite any legal in the Magistrate's Report and Recommendation. I therefore adopt it in its entirety. (Filo, Jennifer).

### REPORT AND RECOMMENDATION ON DEFENDANTS' RENEWED MOTION TO DISMISS OR FOR SUMMARY JUDGMENT, and PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS

DEIN, United States Magistrate Judge.

## I. INTRODUCTION

The plaintiff, Leo V. Felton ("Felton"), "an avowed white supremacist," was convicted on July 26, 2002 on a number of offenses arising out of a bank robbery, counterfeiting, and the planned construction of an explosive device. *See United States v. Felton,* 417 F.3d 97, 99 (1st Cir. 2005). Felton appealed, and on July 29, 2005, the First Circuit reinstated one conviction which had been dismissed by the trial judge, affirmed the other convictions, and remanded the case for resentencing. *Id.* at 107.

Felton is presently incarcerated at the Federal Correctional Institute at Lewisburg, Pennsylvania. The instant case, however, arises from Felton's pre-trial detention at the Plymouth County Correctional Facility ("PCCF"). Felton brought this action pursuant to 42 U.S.C. § 1983 against Charles B. Lincoln ("Director Lincoln"), Director of Security at PCCF; Richard Cardinal ("Captain Cardinal"), Disciplinary Hearing Officer at PCCF; Brian Gillen ("Dep.Supt.Gillen"), Deputy Superintendent of PCCF; and Sheriff Joseph McDonough ("Sheriff McDonough"), Superintendent of PCCF (collectively, the "defendants"). The defendants are all sued in their individual and official capacities.[1]

The crux of Felton's Complaint (Docket No. 6) as amended (Docket Nos. 31, 48) is that (1) PCCF personnel wrongfully reviewed and confiscated material which was part of the discovery in his underlying criminal case and which had been sent to him by counsel, (2) Felton was wrongfully disciplined for possessing such material, and (3) there was wrongful interference with other incoming and outgoing mail, in violation of various regulations. All of this conduct, according to Felton, violated "the Privileges and Immunities Clause of Article IV of, and the 1st, 8th and 14th Amendments to, the U.S. Constitution, Title 42 of the U.S.Code; the laws of the Commonwealth of Massachusetts, and the Massachusetts Declaration of Rights." Complaint ("Compl.") at Introduction. Felton is seeking compensatory and punitive damages in the amount of one million ($1,000,000.00) dollars.

This matter is presently before the court on "Defendants' Renewed Motion to Dismiss or in the Alternative for Summary Judgment" (Docket No. 43) and on plain-

---

1. The positions of the defendants are as of the date the Complaint was filed.

tiff's "Motion for Judgment on the Pleadings" (Docket No. 49). For the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the defendants' Motion be ALLOWED, and that the plaintiff's Motion be DENIED.

## II. STATEMENT OF FACTS

### Procedural History

Felton commenced this action by filing a Complaint dated May 9, 2002, which was received by the court on May 23, 2002. On September 5, 2002, the defendants filed a Motion to Dismiss, or in the Alternative, for Summary Judgment. The court allowed the plaintiff's Motion for Appointment of Counsel on January 23, 2003, and the defendants' Motion was ruled moot on June 9, 2003, pending appointment of counsel.

On June 1, 2004, the court revoked the order appointing counsel, and gave Felton until September 1, 2004 to hire an attorney. No counsel has entered an appearance, and the plaintiff is proceeding *pro se*. The defendants filed their Renewed Motion to Dismiss or in the Alternative for Summary Judgment on March 30, 2005. Felton filed his Motion for Judgment on the Pleadings on August 1, 2005. Both motions are opposed.

### Basis for Complaint

The following facts are taken from the parties' pleadings, and the exhibits attached thereto. In light of the large number of exhibits relied on by all parties, which are all uncontested, the defendants' express statement that their motion could be considered as a motion for summary judgment, the plaintiff's representation in his motion that this court now has sufficient information to address all the issues in his complaint, *see* Motion for Judgment on the Pleadings ¶¶ 4–5, and the plaintiff's own reliance on materials outside the pleadings, this court will consider the defendants' motion as being one for summary judgment. *See Gulf Coast Bank & Trust Co. v. Reder*, 355 F.3d 35, 38–39 (1st Cir. 2004) (court may treat motion as one for summary judgment where party presented additional materials in connection with a motion for judgment on the pleadings).[2]

### Confiscation of Legal Materials

According to Felton's complaint, on April 22, 2002, Director Lincoln ordered the housing unit officers in plaintiff's unit to confiscate legal materials "consisting exclusively of discovery material, copies of motions and other correspondence from [Felton's] attorney relative to U.S. v. Felton, Criminal # 01–10198–NG." Compl. ¶ 7. The defendants contend that this confiscation was done pursuant to PCCF rules which allow inmates to possess only five (5) inches of legal materials in their cells. *See* Defendants' Memorandum of Law in Support of its (sic) Renewed Motion to Dismiss or in the Alternative for Summary Judgment ("Defs.Mem.") (Docket No. 44) at 2–4. While Felton does not challenge the existence or validity of this rule, and admits that he had more material than the amount allowed, he points out that months before, on August 9, 2001, the court had allowed Felton's motion to have more than five inches of legal materials in his cell. *See* Plaintiff's Opposition to Defendant's Renewed Motion to Dismiss or for Summary Judgment ("Pl.Opp.") (Docket No.

2. Since Felton is the non-moving party in connection with the principal motion presented, the motion for summary judgment, the record will be viewed in the light most favor-

able to Felton. *See Roldan–Plumey v. Cerezo–Suarez*, 115 F.3d 58, 61 (1st Cir.1997). Such a liberal reading of the record is also warranted since Felton is proceeding *pro se*.

47) Ex. 1. The record reveals that after the materials were confiscated Felton's counsel, Lenore Glaser, worked with prison officials to have the materials stored, yet accessible, for Felton's use. *See, e.g.,* correspondence included in Defs. Mem. Ex. C. The record also shows that counsel's involvement remained necessary because she continued "to have ongoing concerns about the confidentiality of Leo's legal mail and access to his legal discovery materials and to this attorney by telephone." Pl. Opp. Ex. 7 (Letter from Attorney Glaser dated May 13, 2002).

### Disciplinary Action

On April 25, 2002, Felton received a Disciplinary Report (a "ticket") signed by Officer Lincoln as the "Reporting Officer." Compl. Ex. 1. Felton was cited for violating three rules, specifically—(1) violating any institutional rule or regulation; (2) counterfeiting, forging or unauthorized reproduction of any document; and (3) conduct which disrupts the security/orderly running of the institution. The offenses were described as follows:

Inmate Leo Felton ... did on diverse dates violate the policies and procedures of (PCCF) Plymouth County Correctional Facility by circumventing the mail procedures. Inmate Felton has participated and advocated the violation of these procedures through the use and abuse of attorney client markings and labels. Inmate Felton has received and disseminated (sic) material which encourage the use of physical violence, including but not limited to advertisements on how to order escape tools, firearm silencers, booby traps, stun guns, books on how to make high explosives and shaped charges.

He has violated the PCCF policy on prohibition of inmate to inmate correspondence.

Inmate Felton's behavior has been determined to be detrimental to the security, good order and discipline of the PCCF. His correspondence, incoming and outgoing, depicts or encourages activities, which may lead to the use of physical violence or group disruptions.

Compl. Ex. 1. Among the materials which were found to be inappropriate were materials which apparently had been seized by the government in connection with Felton's underlying criminal case, and which had been produced by the government during discovery. *See* Pl. Opp. Ex. 2 (defendants' answers to interrogatories identifying material referenced in disciplinary report). Copies of the materials which the government had produced had been sent to Felton's counsel, Lenore Glaser, Esq., who, in turn, had forwarded it to Felton. *See* Compl. ¶ 10. In particular, Felton contends that PCCF objected to a *Fire Quest* catalog. Pl. Opp. Ex. 5. Felton has submitted a letter dated August 5, 2002 from Director Lincoln to Attorney Glaser in which Director Lincoln stated that the *Fire Quest* catalog "was not marked as legal mail" and was "not allowed in this facility and considered to be contraband, regardless of its source." Pl. Opp. Ex. 3. Felton disputes Director Lincoln's description of when and how the catalog was discovered. Moreover, he contends that the catalog was part of the government's discovery. *See* Pl. Opp. at 2–6. The record is unclear whether Felton was actually permanently deprived of access to the catalog, although it is clear that his attorney had access. A copy of the catalog was submitted to the court by Felton. Pl. Opp. Ex. 5.

### Evidence at the Disciplinary Hearing

Following his receipt of the ticket, Felton filed a PCCF "Request for Staff Assistance and/or Witness" form requesting

that the reporting officer be present at the Disciplinary Hearing, and that he be allowed to call as witnesses (1) Attorney Glaser to testify that she had sent him the materials which had been confiscated; (2) AUSA Ted Merritt to testify that he had produced the challenged materials to Attorney Glaser; and (3) Maryellen Malloy, Courtroom Deputy Clerk to United States District Judge Nancy Gertner, to testify that she has copies in evidence of all of the challenged documents. Compl. Ex. 2. In the form, Felton declined the assistance of "a staff member (to be designated by the Deputy Superintendent) at the Disciplinary Hearing." *Id.* Felton also requested "pursuant to 103 CMR 421.11(4) and Mass. Gen. Laws ch. 66" that the disciplinary hearing be tape recorded. Compl. Ex. 3. He also requested, "pursuant to 103 CMR 421.10(6)," that he be represented by his counsel at the hearing. *Id.* Meanwhile, Felton had contacted his counsel, Attorney Glaser, who spoke to Director Lincoln for approximately one hour on April 25, 2002, and explained that the materials which had been confiscated about explosives, firearms, silencers, identity cards and counterfeiting, all had been produced by the government as part of its discovery obligations in the criminal litigation. *See* Compl. Ex. 4. She had also agreed with Deputy Superintendent Gillen and Director Lincoln that she would review the materials in an effort to reduce the amount which was necessary to be kept in Felton's cell. *Id.*

The Disciplinary Hearing was held on April 26, 2002. Compl. ¶¶ 11–14. *See* Affidavit of Captain Richard Cardinal ("Cardinal Aff.")[3] ¶ 3. At that time, Captain Cardinal denied Felton's request for an attorney and for a tape recording of the proceedings. Cardinal Aff. ¶ 4; Compl. Ex. 5 ¶ 4(b). Captain Cardinal concluded

that the requests were "frivolous, and disruptive to the safety security and order of the facility." Compl. Ex. 5 ¶ 4(b). He also concluded that "after receiving testimony from Director Lincoln and the evidence he presented to me, I believe receiving testimony from Mr. Felton's requested witnesses is unnecessary and his request is denied." Compl. Ex. 5 ¶ 5; Cardinal Aff. ¶ 5. According to the report of the disciplinary hearing, Director Lincoln had testified as follows:

> I talked to Mr. Felton's attorney, he wasn't disciplined for the material sent to him by his attorney, he was disciplined for forging his attorney's label and then falsely labeling personal mail as legal mail.

Compl. Ex. 5 ¶ 6(c).

Captain Cardinal received as evidence the disciplinary report, Felton's statement that "all this material was sent to me by my attorney, as the result of my attorney filing a discovery motion in U.S. District Court," and "copies of letters sent by inmate Felton describing how to use forged name and address labels falsely identifying personal correspondence as legal mail." *Id.* ¶¶ 6(a), 8. While the specific evidence that was introduced at the hearing is not identified in the record, there is evidence in the record that on March 2, 2002, PCCF personnel were notified by the Bureau of Prisons at the maximum security unit in Florence, Colorado that Felton was communicating with a "white supremist" inmate there, Richard Scutari, by sending mail "disguised as attorney client legal mail." Defs. Mem. Ex. H. In the letter to Scutari, Felton brags about having a "totally secure" way to communicate, *i.e.*, by marking communications as attorney-client mail. *Id.* Apparently included with the letter was an article entitled "Hate Thy

3. The affidavit of Captain Cardinal is attached to Defs. Mem. as Exhibit E.

Neighbor," about hate groups. *Id.* The record also contains a letter from Felton dated March 19, 2002, to an unidentified recipient, complaining about the interference with his mail. Defs. Mem. Ex. H. In there Felton wrote, in relevant part:

> The way to guarantee that it won't be read and that I will get it is to send it legal mail. You do that by making an envelope on your computer with a return address of a lawyer, like this [example in letter]. Don't use this return address, just make one up. "Goldberg, Rothman and Stone, Attorneys at Law," and a made-up street address in Boston. Then write my address, by hand, and underneath it in big letters write "ATTORNEY–CLIENT CORRESPONDENCE." What this does is makes it so they have to open it in my presence and can't read it for any reason... I've had my friends send me material this way for years, in state and county facilities in Jersey, NY, MD, and at this jail, and have never had a problem. So this is really the best way to go, and cheaper than certifying it.

Defs. Mem. Ex. H. It appears that it is Felton's contention that this letter was confiscated from his cell, and he never attempted to mail it. *See* Pl. Opp. at 9.[4] However, he does not deny that he wrote it.

Felton has submitted three envelopes produced by the defendants in response to a document request for "all mailing labels which the defendants claim I forged and all envelopes which the defendants claim I falsely marked or labeled." Pl. Opp. at 6.[5] One has a typed return address of Attorney Glaser addressed to Felton, one has a handwritten address from Felton to a lawyer he contends is his ex-wife's counsel, and one with the return address of "Draper & Goldburg Law Firm" addressed to inmate Richard Scutari in Florence, Colorado. Pl. Opp. Ex. 9. Felton claims that the first two envelopes relate to legitimate attorney communications. Pl. Opp. at 8. He denies sending the last envelope, which was post-marked from Virginia at a time he was incarcerated. *Id.* Apparently, however, the defendants believe that it was mailed by Felton's associate. *See id.* at 9. It appears to be the envelope containing the letter to Richard Scutari discussed above.

Finally, there is evidence in the record that as of September 21, 2001, Mr. Lincoln had information that Felton and his co-defendant, Erica Chase, were using a third person to communicate with each other. Defs. Mem. Ex. G (2/21/01 letter to "Father Isaac"). Specifically, PCCF contends that Felton and Chase were violating the policy precluding them from communicating with other inmates by sending letters addressed to "Father Isaac" which he would then send to the other, using his return address.

---

4. There is also evidence in the record of a newspaper article dated July 18, 2002 describing the testimony of Thomas Struss at Felton's trial. Def. Mem. Ex. I. According to the article, Aryan Brotherhood members "smuggled hate literature and neo-Nazi tracts into prison. In a process they called 'berging,' a reference to Jewish surnames, accomplices on the outside would mix racist literature with legal papers in an envelope labeled 'legal materials'—which by law prison officials cannot read—and affix false return address labels with phony law firm names like Greenberg & Weinberg. Felton bragged in a letter to [co-defendant] Chase that his ruse had always fooled authorities." *Id.* Since this article post-dates Felton's disciplinary hearing, it was obviously not the basis for his discipline.

5. Felton claims that the defendants rely on these envelopes to support their claim that he falsely labeled personal mail as legal mail. Pl. Opp. at 7.

### The Decision on Discipline

After hearing from Director Lincoln and reviewing his evidence, Captain Cardinal postponed any determination until he could be contacted by any of Felton's witnesses. Cardinal Aff. ¶ 7. *See* Compl. ¶ 14. He then included in the evidence Attorney Glaser's written statement, confirming that the confiscated material was discovery in Felton's case. Compl. Ex. 5 ¶ 8; Cardinal Aff. ¶ 7. Felton was found guilty of all three charges. Compl. Ex. 5 ¶ 7. Captain Cardinal's "statement of evidence relied upon to support findings" reads as follows:

> D–Report, Inmate's statement, copies of letters sent by inmate Felton describing how to use forged name and address labels falsely identifying personal correspondence as legal mail, and a written statement from his attorney Lenore Glaser, Esq.

Compl. Ex. 5 ¶ 8. In support of the defendants' motion for summary judgment, Captain Cardinal explained that "[t]he evidence clearly showed non-privileged letters advocating a misuse of the 'Attorney–Client' legal mail procedures. Based on this evidence, I found the Plaintiff guilty on all three charges." Cardinal Aff. ¶ 8. Felton claims that this is just a ruse, and that he was in fact found guilty on the basis that he possessed materials produced in discovery. *See* Pl. Opp. At 6 ("the defendants imposed punitive sanctions on me for my having possessed discovery material from my criminal case"). Felton was punished with 24 days of punitive segregation and 60 days loss of visits, phone and canteen. Compl. Ex. 5 ¶ 9, Compl. ¶ 17. The sanctions were imposed, according to the disciplinary report, "to ensure the safety, security and order in the institution." Compl. Ex. 5 ¶ 10.

Felton appealed his disciplinary decision. Compl. ¶ 19; Compl. Ex. 6. The decision was upheld by defendant Dep. Supt. Gillen in a decision dated May 6, 2002. Compl. Ex. 7. Therein, Dep. Supt. Gillen concluded that PCCF's policy did not allow for attorneys to participate in disciplinary cases, and that Felton was relying on regulations governing state facilities, not county facilities. *Id.* He further concluded that he had reviewed the reports and the appeal, and found "no reason to change the disposition." *Id.* Felton was taken to isolation on May 8, 2002. Compl. ¶ 21.

### Interference with Mail

Felton also contends that the defendant Lincoln continuously held his mail without notice to Felton, in violation of the regulations contained in 103 C.M.R. 481. *See* Compl. ¶¶ 22–24. According to Felton, during the period of approximately September—November 2001, Director Lincoln kept seven (7) letters without giving proper notice of their retention.[6] *Id.* ¶ 23. After his lawyer's involvement, he did get official notice of refused mail forms. *Id.* ¶¶ 24–25. Nevertheless, and despite his counsel's involvement, according to Felton the situation did not improve. *Id.* ¶ 26. On March 4, 2002, Felton filed a grievance complaining that his mail was being wrongfully withheld. *Id.* ¶ 27; Compl. Ex. 9. On March 18, 2002, Felton wrote a letter to Mr. Gillen, *again complaining that* his mail was being wrongfully withheld without notice to him in violation of 103 C.M.R. 481.16 and 481.17. Compl. Ex. 10. By letter dated March 19, 2002, Dep. Supt. Gillen responded that the issue must be addressed through the grievance procedures. *Id.* On March 20, 2002, Captain Cardinal disapproved the grievance, con-

---

**6.** There is evidence in the record that during this period, as well as at various other times, Felton was given official notice of refused mail. *See* Def. Mem. Ex. G.

cluding that "We are not holding any of your mail, we are processing your mail as per our policy." Compl. Ex. 9. Felton appealed and on March 27, 2002 Dep. Supt. Gillen denied the appeal, concluding that "we are processing your mail per policy and procedure." *Id.*

Felton contends that PCCF violated 103 C.M.R. 481.14(3) and (4) prohibiting the reading of mail without authorization from the Superintendent, and requiring that a log book be maintained. Compl. ¶ 30. Attorney Glaser arranged for a subpoena to be served on PCCF on March 21, 2002 for the log book, and was informed that no such log book was kept. Compl. Ex. 11. She was also informed that Director Lincoln was reading Felton's ingoing and outgoing mail, except for legal mail. *Id.*

Felton also is challenging PCCF's policies requiring strict compliance with its rules regarding how mail is to be addressed. Compl. ¶ 32; Compl. Ex. 12. Thus, according to Felton mail missing a portion of the return address or a prisoner's middle initial, unit, cell number or the letters "PCCF" was returned to the post-office without notice to either the sender or recipient. Compl. ¶ 32. Felton further challenges PCCF's criteria for rejecting mail, periodicals and books as "arbitrary in the extreme." Compl. ¶ 33. He cites as an example PCCF's refusal, through Director Lincoln, to deliver a package from Dover Publications on April 25, 2002 containing "The Complete Sonnets of William Shakespeare; Selected Poems of Emily Dickinson; The Raven and Other Poems, by Edgar Allen Poe; The Myths of Greece & Rome, by HA Guerber; and Drawing the Living Figure, by Joseph Sheppard" on the grounds that it contained sexual/obscene material. Compl. ¶¶ 33–34; Compl. Ex. 13. Felton appealed the decision, claiming that he was entitled to such material pursuant to "103 CMR 481.15(2)(6),

the 1st Amendment to the U.S. Constitution, and common sense." Compl. Ex. 14. By letter dated April 29, 2002, Dep. Supt. Gillen denied Felton's appeal as follows:

> To maintain facility goals of security, order and rehabilitation the publication pictures you reference were not accepted per policy 481. The contents will be returned to sender. The contents contained nude pictures that are not allowed in the facility. To maintain the security and orderly running of the facility your appeal is denied.

Compl. Ex. 14.

Finally, Felton complains that the defendants tampered with his complaint. Pl. Opp. 6. He contends that the complaint was mailed to the court on May 11, 2002, was intercepted, opened, read and photocopied by Mr. Lincoln and sent to the defendants' legal department before being forwarded to the court where it was received on May 23, 2002. *Id.* at 7. Felton relies on a letter from his counsel dated May 20, 2002 (attached to the Motion for Judgment on the Pleading). Therein, counsel referenced a conversation with Director Lincoln about Felton's mail, including why the legal mail was sometimes delayed. Counsel was given a view of the mail room and a log of all legal mail. Attorney Glaser also wrote "[h]e also told me that your complaint was received and referred to their legal department. He asked me for a list of the dates that I have sent correspondence to you. I told him that it was confidential, and he would have to subpoena it." This court is unable to discern from this letter whether the "complaint" refers to the civil complaint in this action, or another complaint about the mail. Moreover, even if the reference is to the complaint in this action, the record is unclear whether the copy was made from what was sent to the court. Felton argues, and the defendants' dispute, that this

letter is an admission that the complaint to the court was intercepted.

Additional facts will be provided below where appropriate.

## III. ANALYSIS

### A. Standard of Review of the Pending Motions

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant ... would permit a rational fact finder to resolve the issue in favor of either party." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990) (internal citations omitted). A material fact is one which has the "potential to affect the outcome of the suit under the applicable law." *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir.1996) (internal citations and quotation omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. *See id.* at 324, 106 S.Ct. at 2553. In evaluating motions for summary judgment, however, the court will not consider "conclusory allegations, improbable inferences, and unsupported speculation." *Galloza v. Foy*, 389 F.3d 26, 28 (1st Cir.2004) (internal citation omitted). Moreover, "motions for summary judgment must be decided on

the record as it stands, not on litigants' visions of what the facts might some day reveal." *Maldonado–Denis v. Castillo–Rodriguez*, 23 F.3d 576, 581 (1st Cir.1994).

Fed.R.Civ.P. 12(c) provides that a party may move for judgment on the pleadings at any time "[a]fter the pleadings are closed," provided that the motion does not delay the trial. *See Gulf Coast Bank & Trust Co.*, 355 F.3d at 37–38. The generally recognized standard is "whether the pleadings, taken as a whole, reveal any potential dispute about one or more of the material facts." *Id.* at 38, and authorities cited. Where, as here, the court considers, at the moving party's request, material outside the complaint and answer, the standard for summary judgment motions is applied to the motion for judgment on the pleadings. *Id.*, and authorities cited.

Applying the relevant principles to both pending motions compels the conclusion that the defendants' motion for summary judgment should be allowed, and the plaintiff's motion for judgment on the pleadings should be denied.

### B. Standard of Review for Claims Under 42 U.S.C. § 1983

 Felton has asserted various claims against the defendants seeking recovery under 42 U.S.C. § 1983 for alleged violations of his constitutional rights. Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393–94, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989) (quotations and citation omitted). It states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the

jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. "A claim under section 1983 has two essential elements. First, the challenged conduct must be attributable to a person acting under color of state law" and "second, the conduct must have worked a denial of rights secured by the Constitution or by federal law." *Soto v. Flores*, 103 F.3d 1056, 1061 (1st Cir.), *cert. denied*, 522 U.S. 819, 118 S.Ct. 71, 139 L.Ed.2d 32 (1997). In the instant case, there is no dispute that each of the individual defendants was acting in his official capacity at all relevant times and was therefore acting under color of state law. However, the defendants dispute that any of their conduct deprived Felton of his constitutional rights. Moreover, the defendants contend that even if they violated Felton's constitutional rights, they are shielded from liability by the doctrine of qualified immunity.

As detailed herein, this court concludes that the record does not support the assertion that the defendants' violated Felton's constitutional rights. If constitutional violations are, however, found, the claims against Sheriff McDonough should be dismissed on the basis of qualified immunity.

### C. *The Alleged Constitutional Violations*

 It is beyond dispute that "that federal courts must take cognizance of the valid constitutional claims of prison inmates" and that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). Nevertheless, it is also beyond dispute that

"[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint." *Id.* at 84–85, 107 S.Ct. at 2259. Prison administrators, and not the courts, are responsible for making "the difficult judgments concerning institutional operations." *Lewis v. Casey*, 518 U.S. 343, 361, 116 S.Ct. 2174, 2185, 135 L.Ed.2d 606 (1996) (internal citations omitted). It is against this backdrop that Felton's claims of constitutional violations must be assessed.

#### 1. *Confiscation of Materials in Cell*

 Felton challenges the decision by PCCF to confiscate the discovery provided to him by his counsel which he kept in his cell. Although Felton has not identified the constitutional right at issue, it appears that he is contending that his due process rights have been violated because his access to the legal material was limited. *See Lewis*, 518 U.S. at 351, 116 S.Ct. at 2180 ("meaningful access to the courts" is constitutionally guaranteed). Reading the record in the light most favorable to Felton, however, fails to establish a constitutional violation.

██ Felton has put forth evidence to establish that PCCF did err in confiscating the material in his cell. While the defendants rely on the administrative rule limiting the amount of legal material to five inches, Felton has established that he had express judicial authorization to have material in excess of that amount in his cell. However, as detailed above, Felton's counsel engaged in extensive discussions with

prison personnel to make sure that the material was available for Felton's review in preparation for his trial. There is no evidence that Felton's defense was in any way impaired as a result of having the material temporarily confiscated. Absent an injury-in-fact, Felton cannot establish his claim that his constitutional right to meaningful access to the court was violated. *Id.* at 351–52, 116 S.Ct. at 2180 (actual injury must be established to sustain a claim of denial of meaningful access to the courts).[7] A mere violation of internal regulations simply does not always result in a constitutional violation. *King v. Higgins,* 702 F.2d 18, 20–21 (1st Cir.1983).

## 2. *Disciplinary Proceedings*

 Felton contends that he was wrongfully disciplined because of his possession of discovery material in his cell. Again, Felton has failed to identify the constitutional basis for this claim, although he is presumably raising a due process challenge.[8] Moreover, as a factual matter the record does not support his contention.

 "In Massachusetts, as in every other State, prison inmates are protected by the due process clause of the Fourteenth Amendment to the United States Constitution." *O'Malley v. Sheriff of Worcester County,* 415 Mass. 132, 135, 612 N.E.2d 641, 645 (1993). Consequently, prisoners have the procedural protections of due process, but "only if there is an existing liberty or property interest at stake." *Id.* "[A]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Id.* at 136, 612 N.E.2d at 645 (quoting *Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976)).

 In the instant case, citing federal cases only, the defendants contend that the "plaintiff's short disciplinary detention does not rise to the level of a constitutional violation." Def. Mem. at 6. However, while there is "no Federal liberty interest regarding disciplinary isolation," Massachusetts regulations have created "a protected liberty interest in avoiding disciplinary isolation." *O'Malley,* 415 Mass. at 136–137, 612 N.E.2d at 645–46 (1993). *See also Superintendent, M.C.I. Walpole v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 2773, 86 L.Ed.2d 356 (1985) ("due process requires procedural protections before a prison inmate can be deprived of a protected liberty interest in good time credits."). In the instant case, Felton was placed in segregation, apparently a significant

---

7. "[W]here the challenge is systemic, embracing the basic adequacy of materials and legal assistance made available to all or subgroups of the prison population" or "the conditions challenged obviously go the heart of any meaningful access to libraries, counsel, or courts," no actual injury may be needed. *Ferreira v. Duval,* 887 F.Supp. 374, 381 (D.Mass.1995) (quoting *Sowell v. Vose,* 941 F.2d 32, 34–35 (1st Cir.1991) (internal punctuation and citations omitted)). No such widespread conditions are at issue here.

8. While Felton cites the 8th Amendment in his complaint, he has asserted no facts which would allow a fact finder to conclude that the conditions of his confinement, or the discipline imposed, violated the 8th Amendment to the Constitution. "To succeed on an Eighth Amendment claim, a plaintiff-inmate must demonstrate that (1) a prison's conditions of confinement present 'a substantial risk of serious harm'; and (2) prison officials acted with deliberate indifference' to inmate health or safety." *Torres v. Commissioner of Correction,* 427 Mass. 611, 613–14, 695 N.E.2d 200, 203 (1998). No such allegations have been made here.

change in his condition of confinement. While the defendants have not addressed whether Felton's punishment differs from punitive isolation, this is clearly not a case where the inmate suffered only a loss of privileges. A loss of privileges alone might not implicate due process requirements. *See McLellan v. Acting Superintendent, M.C.I., Cedar Junction,* 29 Mass. App.Ct. 122, 126, 558 N.E.2d 5, 8 (1990) (citing *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). In light of the punishment imposed, this court will assume that procedural due process requirements apply.

■ To satisfy federal due process requirements "the inmate must receive: (1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action." *Supt. of M.C.I. Walpole,* 472 U.S. at 454, 105 S.Ct. at 2773. All of these elements have been satisfied.

First, Felton had advance written notice of the disciplinary charges. While he claims that he was being disciplined solely for having discovery material in his cell, the original ticket charged him both with "the use and abuse of attorney client markings and labels" as well as the receipt and dissemination of contraband material. Compl. Ex. 1. He was also charged with violating the prohibition on inmate to inmate correspondence. *Id.* Thus, it was clear from the outset that the charges were not limited to Felton's possession of contraband material in his cell.

Even assuming that Felton is correct, and that his possession of the discovery material played a role in the decision to issue the ticket, the record is clear that by the time discipline was imposed, Captain Cardinal understood that the discovery material had been provided by counsel. The disciplinary report provides that actual punishment was based on the fact that Felton was found to have mislabeled material as attorney/client correspondence, and to have encouraged others to do the same. The description in the disciplinary report of the evidence relied on further supports the conclusion that discipline was issued due to the original charge of the use and abuse of attorney client labels and markings. The notice given to Felton was sufficient to satisfy his due process rights.

Similarly, the fact that Felton was not allowed to call his proposed witnesses did not violate due process. The witnesses Felton proposed to call all were to testify that material in his cell was discovery which had been produced by the government in connection with his criminal trial. However, the defendants accepted Attorney Glaser's statement as true as to that point, and there was no need to have witnesses testify to a fact that was not in dispute. *See Smith v. Mass. Dept. of Corr.,* 936 F.2d 1390, 1399–1400 (1st Cir. 1991) (citing *Ponte v. Real,* 471 U.S. 491, 497, 105 S.Ct. 2192, 2196, 85 L.Ed.2d 553 (1985)) (right to call witness not absolute, and officials may decline to allow witnesses to testify if appropriate reason stated on the record). Felton was granted time to submit additional evidence and a letter was received from his counsel. Thus, this element of due process has been satisfied as well.

Finally, Felton does not dispute that he was provided with a written statement of the evidence relied on and the basis for the disciplinary decision. Moreover, there was substantial evidence to support the adverse findings, including the letter to inmate Scutari. *See McLellan,* 29 Mass.App. Ct. at 127, 558 N.E.2d at 9 (Federal constitution requires that some evidence support

the disciplinary findings, while Massachusetts law requires substantial evidence). His federal due process rights were not violated.

Felton also contends that he was deprived of rights in connection with his disciplinary hearing which were guaranteed to him by state law. Thus, Felton contends that he was not allowed to have counsel present, and that the right to counsel is guaranteed by 103 C.M.R. 421.10(6). However, by its terms, the regulations found at 103 C.M.R. 421.000 are "applicable to all state correctional facilities." 103 C.M.R. 421.04. PCCF, however, is a county facility and is governed by 103 C.M.R. 900.00. *See generally* Mass. Gen. Laws ch. 125, §§ 1(f) (defining county correctional facility) and 1(n) (defining state correctional facility). County facility regulations make no reference to the right to counsel, and it is clear that the county facilities have not adopted the state facility regulation, 103 C.M.R. 421.10(6), which requires the inmate to submit a request form "[i]f the inmate wishes to be represented by an attorney or law student or have certain witnesses testify[.]" The request form for PCCF, in contrast, requires the inmate to specify if he wishes "to be assisted by a staff member (to be designated by the Deputy Superintendent) at the Disciplinary Hearing" consistent with 103 C.M.R. 943.06. Compl. Ex. 2.[9] There is no federal constitutional right to counsel in disciplinary proceedings, *Wolff*, 418 U.S. at 570, 94 S.Ct. at 2981, and so, absent a specific regulation, there is no requirement that the state provide for attorney representation at all disciplinary hearings. Thus, the failure to allow Felton to be represented at the disciplinary hearing does not constitute a violation of his constitutional rights.

Moreover, even if Felton was entitled to counsel, the record shows that his counsel was, in fact, involved in the disciplinary proceedings by way of telephone conversations and letters. In addition, Attorney Glaser visited the facility and actively communicated with PCCF personnel regarding Felton's complaints. There is no indication in the record that Felton wanted or needed the further involvement of counsel. Nor does Felton identify any harm which was been caused by his proceeding without counsel at the disciplinary hearing. For these additional reasons, this court concludes that Felton's challenges to his disciplinary proceedings must fail.

Felton also challenges the lack of a tape recording of the proceeding, as authorized by 103 C.M.R. 421.11(4). Again, however, these regulations are specifically applicable to state correctional facilities. 103 C.M.R. 421.04. Felton was informed of the basis of the decision and the evidence relied on. His claim does not rise to the level of a constitutional violation.

### 3. *Interference with Mail*

It is well established that inspection of an inmate's mail may implicate

---

9. This court recognizes that in the unpublished decision of *Parzyck v. Dubois,* Civ. Action No. 94–30032–MAP, 1994 WL 606314, *4, 1994 U.S. Dist. LEXIS 15870, *13 (D.Mass. Nov. 4, 1994), the court found that "[w]hile it is not clear, the more reasonable approach is to assume" that regulations regarding disciplinary hearings should apply to all facilities governed by the Department of Correction. However, the regulations have been modified a number of times since that decision, and there are specific regulations governing procedures for disciplinary hearings in county facilities. *See, e.g.,* 103 C.M.R. 943.06. In light of these specific county facility regulations, this court does not find that regulations, limited on their face to state facilities, create constitutional rights in county facility inmates.

First Amendment rights. *Stow v. Grimaldi*, 993 F.2d 1002, 1003–04 (1st Cir.1993). It is equally well established that prison officials may inspect an inmate's mail, and impose restrictions in furtherance of "one or more of the substantial governmental interests of security, order and rehabilitation." *Id.* at 1004 (citing *Procunier v. Martinez*, 416 U.S. 396, 413–14, 94 S.Ct. 1800, 1811–12, 40 L.Ed.2d 224 (1974)). *See also Thornburgh v. Abbott*, 490 U.S. 401, 413, 109 S.Ct. 1874, 1881, 104 L.Ed.2d 459 (1989) (describing standards of review for regulations governing incoming and outgoing mail). Felton does not challenge the constitutionality of the standards incorporated in the county correctional facility regulations; rather, he contends that the regulations were not followed in his case. However, a review of the record in the light most favorable to Felton establishes that not only has he failed to put forward competent evidence to support his claims, but also any alleged violations of the policies were de minimis, and do not rise to the level of a constitutional violation.

The regulations provide that privileged mail is to be sent unopened if it meets certain labeling requirements, and incoming privileged mail "may not be opened except in the presence of the addressed inmate and then for the sole purpose of ascertaining that its contents are free from contraband." 103 C.M.R. 948.06. *See also Wolff*, 418 U.S. at 575–77, 94 S.Ct. at 2984–85. Incoming non-privileged mail may be inspected. 103 C.M.R. 948.07(1). However, "[t]he opening and inspection of outgoing non-privileged mail shall only be done upon the authorization of the Sheriff/Facility Administrator when there is reasonable belief that such action is necessary to maintain the order and security of the facility. Any such inspection of mail should be logged." 103 C.M.R. 948.07(2). Similarly, the Sheriff/Facility Administrator may authorize the reading of non-privi-

leged mail when necessary for security or safety reasons, and the reading of mail "shall be properly recorded." 103 C.M.R. 948.08. Finally, the regulations provide for the disapproval of non-privileged correspondence with notice to the inmate or sender of the material. 103 C.M.R. 948.09.

In the instant case, Felton's claim that mail was not delivered to him is based on the unverified assertion that unspecified family members and friends told him that they had sent mail which did not arrive. These conclusory assertions are insufficient to establish the existence of the underlying facts, much less a constitutional violation.

Felton also objects to the fact that mail was delayed, and that prison officials enforced their rules so stringently as to be arbitrary. The fact that there were delays in delivering the mail does not rise to the level of constitutional violation. *See Lewis*, 518 U.S. at 361–62, 116 S.Ct. at 2185 (fact that some lockdown prisoners routinely experience delays in receiving legal materials or legal assistance, some for as long as 16 days, does not state a claim; where the delays "are the product of prison regulations reasonably related to legitimate penological interests, such delays are not of constitutional significance, even where they result in actual injury"). The fact that Felton was inconvenienced by the strict enforcement of the rules regarding addressing mail, and that, at certain times, he disagreed with the prison officials' assessment as to the appropriateness of materials sent to him, does not render the dispute one of constitutional dimension, especially absent proof of injury. *See Sowell*, 941 F.2d at 34–35 (where "direct access to legal knowledge or assistance is not at stake," but practices interfere with prisoner's "comfort or convenience" in getting access to courts, actual injury is necessary to sustain a claim).

Felton's complaints about the lack of notice when mail was "intercepted" by prison officials appear to have been resolved while Felton was still incarcerated at PCCF. He eventually received formal notices of rejected mail, and his counsel was able to question prison personnel about the status of Felton's communications. Counsel was allowed to inspect the mail room and was provided with information about how the mail review procedures actually worked. While PCCF apparently only kept a log of privileged mail that was inspected, but not of unprivileged material, the keeping of a "log" is not mandatory under the regulations, and Felton has not asserted that he has been harmed in any way. *See* 103 C.M.R. 948.07(2). In such circumstances, the claims do not state a claim under § 1983. *See Sowell,* 941 F.2d at 35–36 (inmate fails to establish genuine issue of material fact to support claim of constitutional violation).

Felton's claim of interference with the filing of his complaint is also unsubstantiated in the record. As detailed above, his counsel's letter does not reflect an admission that the mail was improperly intercepted in any way. In his Motion for Judgment on the Pleadings, Felton relies on the "fact" that when his complaint was received by the court, it lacked exhibits. However, he is in error.[10] In any event, the complaint was filed with the court, and there is no issue of timeliness in the filing. Again, therefore, Felton has not raised an issue of constitutional dimension.

Finally, any claim that the defendants' wrongfully interfered with privileged communications does not find support in the record beyond conclusory allegations. There is evidence which establishes that Felton mislabeled mail as privileged and instructed others to do so, supporting any decision to open mail despite a return address of an attorney. Moreover, Felton's counsel remained involved in dealing with prison authorities regarding Felton's concerns about his mail, and in any event, there are no factual allegations which would support a conclusion that there was any interference with truly privileged mail. For all these reasons, this court recommends that Felton's claims relating to the handling of his mail be dismissed.

### D. *Qualified Immunity*

Finally, the defendants have each moved for summary judgment on the grounds of qualified immunity. Qualified immunity shields government officials performing discretionary functions from liability for civil damages when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In light of this court's conclusion that the plaintiff has failed to establish a constitutional violation, the issue of qualified immunity does not have to be addressed. If, however, the District Judge finds that Felton's claims of violations of his constitutional rights survive the motion for summary judgment, this court recommends that the claim against Sheriff McDonough be dismissed on the grounds of qualified

10. Felton filed a Motion to Amend the Complaint asserting that, when he requested copies of pleadings from the court, the exhibits to the complaint were not included in the package he received on January 31, 2005. (Docket No. 48). From this he argues that the complaint was tampered with by PCCF. (Docket No. 48 ¶ 6). However, the exhibits were received by the court in hard copy but, as was the usual practice, the exhibits were not included when the complaint was scanned into the electronic filing system. The pleadings requested by Felton were printed from the electronic filing system and, therefore, the exhibits were not included in the package sent by the court.

immunity, but that there are disputed facts precluding the entry of summary judgment on the basis of qualified immunity with respect to the other defendants.

Section 1983 provides for a private right of action against public officials who, under color of state law, deprive individuals of rights declared by the Constitution or laws of the United States. Nonetheless, a public official accused of civil rights violations is shielded from claims for damages under section 1983 as long as his conduct did not violate rights that were "clearly established" under the Constitution or under federal law. For purposes of this defense, a right is clearly established if the "contours of the right (are) sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

*Diaz v. Martinez,* 112 F.3d 1, 3 (1st Cir. 1997) (additional internal citations omitted).

For purposes of the pending motions, the defendants do not dispute that the constitutional rights at issue here were "clearly established." Rather, it is the defendants' contention that the record does not support a finding that the individual defendants were sufficiently involved in any allegedly wrongful activities to support a finding of liability. *See* Defs. Mem. at 7–8. Since the status of Sheriff McDonough is different than the others, he will be discussed separately.

### *Sheriff McDonough*

■ "Although a superior officer cannot be held vicariously liable under 42 U.S.C. § 1983 on a *respondeat superior* theory, he may be found liable under section 1983 on the basis of his own acts or omissions." *Maldonado–Denis v. Castil-*lo–Rodriguez, 23 F.3d 576, 581–82 (1st Cir. 1994) (internal citations omitted). Thus, a superior officer may either have personally been involved in the unconstitutional behavior, or he may be liable for "formulating a policy, or engaging in a custom, that leads to the challenged occurrence." *Id.* at 582. Notably, however, "isolated instances of unconstitutional activity ordinarily are insufficient to establish a supervisor's policy or custom, or otherwise to show deliberate indifference." *Id.*

In the instant case, there "is no competent proof" with respect to Sheriff McDonough "of actual participation, or of a policy of tolerating similar violations, or of deliberate indifference. Nor is there proof of a pattern of misconduct sufficient to put the superintendent of [PCCF] on inquiry notice." *Id.* at 583. Felton relies exclusively on the defendants' admission that "[o]n August 1, 2002 Defendant McDonough told The Boston Herald that PCCF staff had 'confiscated publications explaining how to escape from prison and build bombs, booby traps and stun guns'" from me, and that this was the basis of the above-captioned civil action. Pl. Opp. Ex. 10; Pl. Opp. at 10. The fact that Sheriff McDonough was able to explain the basis of plaintiff's lawsuit to the press is insufficient to establish his personal liability for any wrongdoing. Therefore, this court concludes that Sheriff McDonough is entitled to qualified immunity, and recommends that the action against him be dismissed for this reason as well.

### *The Remaining Defendants*

■ The record presented to the court shows sufficient involvement of the remaining defendants so that if Felton's claims survive summary judgment, the case should proceed against them as well. Thus, briefly, Director Lincoln was allegedly involved in confiscating the materials

from Felton's cell, and testified at the disciplinary hearing both about the confiscation and Felton's alleged misuse of attorney-client mail protections, among other things. Captain Cardinal was the individual who conducted the disciplinary hearing and ordered the punishment about which Felton complains. Deputy Superintendent Gillen was responsible for reviewing and affirming the findings against Felton, both with respect to the disciplinary proceedings and Felton's complaints about his mail. Thus, in contrast to Sheriff McDonough, these individual defendants have much more personal involvement in the challenged conduct.

■ In order to be personally liable under § 1983, a "defendant must have acted 'either outside the scope of his respective office, or if within the scope, he acted in an arbitrary manner, grossly abusing the lawful powers of his office.'" *O'Malley,* 415 Mass. at 142, 612 N.E.2d at 649 (internal punctuation and citations omitted). If Felton has stated a claim under § 1983, there are disputed facts which preclude the entry of summary judgment with respect to the defense of qualified immunity for these defendants.

### IV. CONCLUSION

For all the reasons detailed herein, this court recommends to the District Judge to

whom this case is assigned that the Defendants' Renewed Motion to Dismiss or in the Alternative for Summary Judgment (Docket No. 43) be ALLOWED, and the plaintiff's Motion for Judgment on the Pleadings (Docket No. 49) be DENIED.[11]

February 14, 2006.

11. The parties are hereby advised that under the provisions of Fed.R.Civ.P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. *See*

*Keating v. Sec'y of Health & Human Servs.,* 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 604–605 (1st Cir.1980); *United States v. Vega,* 678 F.2d 376, 378–79 (1st Cir.1982); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *see also Thomas v. Arn,* 474 U.S. 140, 153–54, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985). *Accord Phinney v. Wentworth Douglas Hosp.,* 199 F.3d 1, 3–4 (1st Cir.1999); *Henley Drilling Co. v. McGee,* 36 F.3d 143, 150–51 (1st Cir.1994); *Santiago v. Canon U.S.A., Inc.,* 138 F.3d 1, 4 (1st Cir. 1998).